## IN THE SUPREME COURT OF MISSISSIPPI
### NO. 93-DP-01470-SCT

*CLYDE WENDELL SMITH*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 07/01/93 |
| TRIAL JUDGE: | HON. GRAY EVANS |
| COURT FROM WHICH APPEALED: | LEFLORE COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | WHITMAN D. MOUNGER |
| | W. S. STUCKEY |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY:  MARVIN L. WHITE, JR. |
| DISTRICT ATTORNEY: | FRANK CARLTON |
| NATURE OF THE CASE: | CRIMINAL - DEATH PENALTY - DIRECT APPEAL |
| DISPOSITION: | AFFIRMED - 12/10/1998 |
| MOTION FOR REHEARING FILED: | 12/23/98 |
| MANDATE ISSUED: | 4/12/99 |

**EN BANC.**

**ROBERTS, JUSTICE, FOR THE COURT:**

¶1. Clyde Wendell Smith,[1] along with his younger brother, Jerome Pete Smith, was indicted by a Leflore County grand jury for the November 7, 1992, robbery-murder of Sidon Package Store owner, Johnny B. Smith.[2] Both Clyde and Jerome were found guilty of capital murder by a Leflore County jury and subsequently sentenced to death. It is from this judgment, entered on July 1, 1993, that Clyde[3] now appeals, presenting twenty-two separate issues for review by this Court.

¶2. Finding no reversible error, Clyde's conviction of capital murder and sentence of death is affirmed.

### STATEMENT OF FACTS

¶3. At approximately 9:00 p.m. or soon thereafter, on the night of November 7, 1992, Johnny B. Smith, was killed in the liquor store he owned in Sidon, Mississippi, as a result of three gunshot wounds. Taken

from the store were a cash register and an extra cash drawer. Also missing was Johnny's handgun which was either a .32 or .38 caliber weapon. The projectiles recovered from Johnny's body and from the scene were consistent with those of a .38 caliber weapon. Steve Byrd, a forensic scientist at the Mississippi Crime Laboratory, testified that the type of bullets recovered, along with their markings, indicated that they were probably fired from a revolver and not a semi-automatic weapon. Found on the counter at the scene was a bottle of Seagram's gin in a brown paper bag. A latent fingerprint and palm print were lifted from the paper bag and identified as matching those of Clyde's co-defendant, Jerome.

¶4. John Stewart and Lyndell Hunt testified that they were in Sidon and drove by the liquor store between 9:00 and 10:00 p.m. on the night of the murder and saw a red and white car parked between a tin two-story building and the post office, near the liquor store. They both stated that they saw two or three men next to the car and one was carrying an object with a cord dangling from it. The witnesses testified that they thought it might have been a VCR, but they could not tell since they only saw the bottom of it. The State suggested that it was the cash register stolen from the liquor store. One of the men they saw near the car ducked under the steps of the building as if trying to hide. Mack Crigler, who was with Stewart and Hunt that night, did not notice a red and white car, but he did see the men with the object with the cord hanging from it.

¶5. Jerry Smith, the victim's brother as well as a deputy with the Leflore County Sheriff's Department, testified on rebuttal that he was on duty in Sidon on the night of the murder. He and Deputy J.B. Henry were patrolling the area in Henry's patrol car when they drove past the tin building and post office. Deputy Smith saw a red car parked near the buildings. He stated that he noticed that the car had small double windows and a burned place near the exhaust. He also noticed a spot on the ground where the car was leaking transmission fluid. Deputy Smith testified that he saw two people sitting in the car and as the patrol car passed by they slid down in their seats. After passing the car, the deputies crossed the railroad track and went back to the sheriff's office where Deputy Smith dropped off Deputy Henry and went out again. He then received the call that there had been a shooting.

¶6. At trial, Deputy Smith identified a picture of the car Clyde and Jerome had been in the night of the murder as the car he saw parked near the liquor store. He stated that he had also personally examined and identified the car when it was in the custody of the sheriff's office. On cross-examination, Deputy Smith stated that when he passed the car the night of the robbery, although he saw the burned spot near the exhaust, he did not notice the reflective butterfly emblem on the back of the car.

¶7. Kevin Smith, the victim's thirteen-year-old son, was at his father's store just minutes and perhaps seconds before the robbery and murder. His father had called him to come get his jeep which was parked in front of the store. Kevin testified that as he was leaving the store and walking toward the jeep he saw two black men run toward the store. The men were wearing dark clothes and coats and one had on a cap that was knocked off by a tree limb. Kevin identified a cap recovered by the police outside the store after the murder as the one he had seen one of the men wearing that night. Kevin stated that the two men came within five or six feet of him as he was getting in the jeep. One of the men went into the store and the other stayed outside. Kevin then left in the jeep.

¶8. At trial, Kevin identified Clyde and Jerome as the men he saw that night. In a photographic lineup several days after the shooting, Kevin picked out a picture of Jerome as possibly being one of the men he saw that night. He did not pick out Clyde's picture, and in fact, he picked out that of another man. Jimmy

Tindall, Chief Deputy for the Leflore County Sheriff's Department, conducted the photographic lineup. He testified that although Kevin did not pick out Clyde's picture, Kevin stated that if he saw him in person he would probably be able to identify him.

¶9. Witnesses place Johnny still alive shortly before 9:00 p.m. on the night of his murder. His wife, Jeannette Smith, testified that she left Johnny alone at the store around 8:00 that night. A neighbor knocked on her door some time around 9:00 or 9:15 to tell her Johnny had been shot.

¶10. Peyton Crigler, Johnny's cousin, was at the liquor store visiting from 8:30 until about 10 minutes before 9:00. At approximately 9:15, Crigler drove back past the store and saw one person inside whom he took to be Johnny, although he could not really tell who it was. Crigler then drove down a gravel road that connects with Highway 49. He stated that he was going approximately 30 miles per hour when a car came up behind him and passed him. Tommy Peoples found the broken cash register from the liquor store the next morning on the side of Highway 49, south of Sidon about three miles from the gravel road that Crigler was traveling on when passed by the car.

¶11. Carolyn Pearce testified that around 2:00 a.m. on the morning after the murder, she was with Clyde and Jerome in a red and white car in Indianola. When she got into the car the brothers bought a twenty-dollar rock of crack cocaine. She testified that Clyde told her if she was nice to them they would come back and buy $300 or $400 more. She saw Clyde with a lot of loose bills.

¶12. Pearce stated that they started driving toward the outskirts of town so she grabbed the steering wheel. Jerome then pulled out what Pearce described as a "big silver revolver" and began hitting her arm with it. At some point Clyde got into the back seat with her and pulled out a knife and held it to her throat. Then Jerome and Clyde changed seats as well as weapons. The brothers made her take off her clothes and get out of the car naked. Clyde threw her clothes in the street. Outside the presence of the jury, Pearce stated that both men raped her before putting her out of the car naked.

¶13. J.D. Roseman, Isola Chief of Police, was a patrolman at the time of the murder. Sometime between 3:15 and 3:30 a.m. after the robbery and murder, Roseman was on patrol when he spotted a red and white automobile leaving Gresham Service Station in Isola. Roseman went to the service station to see if anything was wrong.

¶14. Roseman then followed the car and noticed that it was weaving some. He stopped the vehicle and turned his spotlight on the car. Roseman walked up to the car and shined his flashlight so that he could see the driver and the front seat passenger. He asked the driver, who he recognized as Clyde Smith, to step out of the car. He recognized the passenger as Jerome Smith. Roseman noticed the two seemed nervous and he asked Clyde what they were doing at the service station. Clyde stated that the car was running hot and they were trying to get some water. Roseman told Clyde that if he would follow him to the fire station they could get some water. Clyde declined, stating that he thought they would make it.

¶15. After talking with Clyde for a few minutes, Roseman decided to let him go. Clyde got back in the car, but when he cranked it, it went dead. Roseman shined his flashlight on the temperature gauge and saw that it read normal. Roseman stated that the car did not smell hot either. Clyde cranked the car again and pulled away.

¶16. Roseman stated that the car the brothers were in was a 1972 white-on-red Ford Elite. After allowing

the brothers to leave, he thought he remembered the town of Sunflower running the car's description and license plate earlier. Sunflower advised him that it had no problems with the vehicle. Roseman then advised the Humphreys County Sheriff's Department to keep an eye out for the vehicle because the brothers were acting suspicious. He ran the license plate and learned it was registered to Clyde and Jerome's sister, Dorothy Smith.

¶17. Roseman then got a radio call from the Inverness Police Department that two black males in a red car had picked up a woman "and was trying to mess with her." Roseman also received a radio call from Tim Goad, a Humphreys County deputy sheriff, who stated that there had been radio traffic from Greenwood that a red and white vehicle was believed to be involved in a robbery and murder in Sidon. Roseman advised Goad that he had just stopped a vehicle matching that description and that he would try to locate the car again.

¶18. Eventually, Roseman met the vehicle going very slowly on Old Highway 49. He radioed Deputy Goad and told him where he had located the vehicle, and that he was going to turn around and follow it and wait for Goad to arrive. Roseman then turned around and began following the vehicle with his lights off so he would not be seen. The vehicle pulled over to the side of the road and stopped. Roseman also stopped about 75 to 100 yards behind the car and waited for Goad to arrive. He was not aware that the brothers had exited the vehicle and were walking down the road.

¶19. Deputy Goad testified that before he got to the location he saw two men who he recognized as Clyde and Jerome Smith, walking down the road about 50 to 75 yards from their car. Before he realized who he had seen, Goad had already passed them. By the time he turned around the brothers had run into a cotton field. Goad and Roseman searched for the men for several minutes, but could not find them.

¶20. While Roseman continued to search, Goad approached the now abandoned vehicle. Goad testified that he shined his flashlight on the inside of the car to see if the keys were still in it. When he did not see the keys, he shined his flashlight on the floorboards. On the back floorboard on the driver's side, he saw a sawed-off .410, single-shot shotgun. He confiscated the shotgun at that time. Goad also found a set of keys stuck in between the fold of the passenger seat. These keys were later identified as fitting the lock on the Sidon Liquor Store where the robbery and murder had earlier taken place.

¶21. Another search of the vehicle by Horace Miller, an investigator with the Mississippi Highway Patrol, turned up a black and white bandanna and a receipt from the Indianola Burger King that showed a purchase at 1:34 a.m. on November 8, 1992. A search of the field where Goad saw Clyde and Jerome run turned up a knife. Henry Bryant, the boyfriend of one of Clyde and Jerome's sisters, identified the knife as a hunting knife he had loaned to Clyde a week before the murder. Carolyn Pearce also identified the knife as the one Clyde had pulled on her.

¶22. Bryant went on to testify about a conversation he had with Clyde and Jerome on the day of the murder. He stated that the brothers were at his house that Saturday afternoon when Clyde mentioned that he was broke and needed some money. Bryant testified that Clyde said that all you had to do was find a place without many police and you could get away with something. Bryant also stated that Jerome had a shiny revolver with him that day, but he did not know what type of gun it was.

¶23. Clyde and Jerome presented an alibi defense. Clyde's girlfriend, Cassandra Jefferson, testified that Clyde was at her house in Belzoni all day until about 8:30 p.m. when he left with Jerome, their sister

Dorothy Smith ("Dot"), and their mother. Jefferson testified that Clyde and Jerome returned to her house at approximately 9:30 p.m. Shortly thereafter, the two left in Dot's red and white car. Jefferson did not see either of the brothers again until around 8:30 or 9:00 a.m. the next morning when they showed up at her house on foot.

¶24. Clyde and Jerome's sister, Dot, testified that a little after 8:00 p.m. on November 7, 1992, she along with her mother went and picked up Clyde at Cassandra Jefferson's house and brought him back to their mother's house. She stated that Jerome was already at the house asleep. At approximately 8:45 p.m., Clyde and Jerome left in her car, a 1975 white-on-red Ford Elite. She did not see the two again until the next morning.

¶25. Yvonne Stewart, the owner of the Isola Lounge in Isola, Mississippi, testified that Clyde and Jerome entered her business sometime around 10:00 p.m. on the night of November 7, 1992. Stewart testified that she knew the time to be close to 10:00 p.m. because when the brothers came in she was on the way out to walk next door to the grocery store to buy ice. The grocery store closed at 10:00 p.m., and when she got there the doors were locked, but she could still see the owners inside counting money. Stewart stated that Clyde and Jerome stayed at the lounge only for five or ten minutes before leaving again.

¶26. The authorities including the sheriff's departments of Leflore, Sunflower, Humphreys and Holmes Counties, the Mississippi Highway Patrol, and the police departments of Greenwood, Belzoni and Itta Bena, started searching for Clyde and Jerome before daylight on Sunday, November 8, 1992. A K-9 unit and the Highway Patrol helicopter were able to follow the tracks from where the brothers went in to the cotton field until they reached the town of Belzoni. By noon the police had obtained warrants for Clyde and Jerome. They then got information that the two were at their brother Elijah's apartment in Sunflower, Mississippi. Ricky Banks, the Leflore County Sheriff, along with members of the Sunflower Police Department, went to Elijah's apartment. Elijah told them that Clyde and Jerome were not there. However, when the police went in to search the apartment Clyde and Jerome were present and were placed under arrest and transported back to the Leflore County jail.

## PRE-TRIAL ISSUES

### I. (6.)[(4)] THE CIRCUIT JUDGE ERRED IN EXCUSING VENIREPERSON TERETHA TAYLOR ON THE BASIS OF HER INTELLIGENCE LEVEL.

¶27. Clyde argues that venireperson Taylor was excused because of her "limited intelligence" in violation of the Sixth, Eighth and Fourteenth Amendments to the United States Constitution as well as similar provisions of Mississippi law. He points out that pursuant to Miss. Code Ann. § 13-5-1 (1972), there is no requisite intelligence level that must be met before a person can serve on a jury. Clyde cites to *Spencer v. State,* 615 So. 2d 688 (Fla. 1993), wherein the Supreme Court of Florida held as reversible error the trial judge's sua sponte excusal of jurors for allegedly having low IQs. In reversing, the Court stated:

> There is no legal basis for excusing a juror based on the trial judge's arbitrary evaluation of the juror's IQ. The fact that the juror was confused is no basis for excusing her in this manner. This type of sua sponte action by the trial judge also has other ramifications in this instance since the juror in question was the only black juror on the jury panel at the time she was excused.

*Spencer,* 615 So. 2d at 690.

¶28. Clyde also latches on to the fact that the trial court asked Taylor if she understood what mitigating and aggravating circumstances were, calling the questions a "modern day version of the discredited voter's 'literary test'. . ." He argues that a number of jurisdictions have held it improper to ask veniremembers to define legal terms that would later be explained in jury instructions, let alone to excuse ones who are unable to do so.

¶29. The State points out that while defense counsel did object to Taylor's dismissal at one point during voir dire, counsel did not object when the trial court finally did excuse Taylor. For this reason, the State argues that the failure to make a contemporaneous objection bars Clyde from raising it for the first time on appeal. *Cannaday v. State,* 455 So. 2d 713, 718-19 (Miss. 1984). The State further argues that Taylor's uncertainty as to whether she could follow the law or whether she could vote to impose the death penalty was sufficient reason for the trial court to excuse her for cause.

¶30. The trial court, as a general rule, may remove a juror when it is of the opinion that the juror can not decide the case competently or impartially, *Pierre v. State,* 607 So. 2d 43, 49 (Miss. 1992), or "'. . .for any reason personal to such person which would make his service as a juror oppressive, or in fact for any reason which to the judge seems sufficient.'" *Nixon v. State,* 533 So. 2d 1078, 1085 (Miss. 1987) (quoting 47 Am. Jur. **Jury** § 121 (1969)). "This Court has also stated that a defendant does not have a vested right to any particular juror but only the right to be tried by a fair and impartial jury." *Johnson v. State,* 631 So. 2d 185, 191 (Miss. 1994) (citing *Gilliard,* 428 So. 2d at 581).

¶31. In the case *sub judice* the record shows that it is highly probable that Taylor would not have been able to adequately follow the trial court's instructions and would have probably been a disruptive force had she sat on the final jury panel. Taylor even stated that she did not believe she would be able to listen to the evidence and the jury instructions and make a determination of guilt or innocence. Taylor later stated that she did not understand exactly why she was there or what the death penalty is. Her answers to the judge's and the attorneys' questions were confusing and she stated on several occasions that being there scared her. When all the individual voir dire of Taylor is taken together, the fact that the trial court asked her if she understood what mitigating and aggravating circumstances are is of little consequence. The trial court was clearly justified in excusing Taylor. This issue is therefore without merit.

¶32. Also, as pointed out by the State, although Clyde's attorney objected to Taylor's excusal at one point during voir dire, he did not object when the trial court actually dismissed her. Furthermore, as noted above, Clyde was not entitled to any particular juror, only to a fair and impartial jury. *Johnson*, 631 So. 2d at 191. Clyde made no objection at trial to the final composition of the jury panel. For these reasons, this issue is also deemed waived for the purposes of this appeal. *Ballenger v. State,* 667 So. 2d 1242, 1251 (Miss. 1995); *Cole v. State,* 525 So. 2d 365, 369 (Miss. 1987); *Irving v. State,* 498 So. 2d 305 (Miss. 1986).

### II. (13.) THE CIRCUIT JUDGE ERRED, IN VIOLATION OF STATE LAW AND THE EIGHTH AND FOURTEENTH AMENDMENTS, IN EXCUSING POTENTIAL JURORS AFTER UNRECORDED BENCH CONFERENCES TO WHICH THE DEFENDANT WAS NOT A PARTY.

¶33. Clyde takes issue, for the first time on appeal, with the trial court having conducted bench conferences with several prospective jurors during voir dire off the record and out of the hearing of the defendant and counsel. He maintains that the trial court had granted a pre-trial motion that the court reporter transcribe the

entire proceedings, and that pursuant to Rule 10(b)(2) of the Mississippi Supreme Court Rules [now known as the Mississippi Rules of Appellate Procedure], which required that the entire trial be transcribed for the benefit of appellate review, it was the duty of the court reporter and the trial judge to see to it that this was done. To support this contention, Clyde also cites to the following cases: *Dobbs v. Zant*, 506 U.S. 357 (1993); *Gibson v. State*, 580 So. 2d 739 (Miss. 1991); *Suan v. State*, 511 So. 2d 144, 147 (Miss. 1987); *Dorrough v. State*, 437 So. 2d 35, 37 (Miss. 1983).

¶34. Clyde also argues that he had the right to be present at all trial proceedings including these bench conferences during voir dire. To support his argument of reversible error, he cites to *Strickland v. State*, 477 So. 2d 1347 (Miss. 1985), in which this Court reversed a drug conviction where the trial court interrogated potential jurors in chambers outside the presence of the defendant or defense counsel.

¶35. The State argues that the instances complained of in the case at bar are factually distinguishable from *Strickland* in that the trial judge interrogated the jurors at the bench and not in chambers and that counsel and defendant were present in the courtroom and failed to object. Nor was any objection raised to the empaneling of the jury on these or any other grounds; and therefore, the claim should be deemed waived and cannot be raised for the first time on appeal.

¶36. The record reveals that while qualifying the jury panel the trial judge questioned potential jurors about statutory exclusions and exemptions. He then questioned the jurors about any hardships they would face by being sequestered for approximately a week. At this point juror Allan Goetzinger raised his hand, and after questioning on the record, the trial court excused him because he had a fifteen-year-old daughter at home with no one to stay with her. The trial judge then made the following statement to counsel:

> **THE COURT:** Gentlemen, do you wish me to tell you the reasons for these being excused? I'll either do so now or be glad to tell you at a later time.

To which counsel for both Clyde and Jerome replied:

> **MR. JONES:** Be fine, Judge. At a later time.

> **MR. STUCKEY:** A later time.

¶37. Thereafter, the trial court questioned several jurors off the record before excusing them and then informing counsel and the defendants of the reasons why they were excused. At no time during these proceeding did Clyde object to any of these potential jurors being excused or to the manner in which they were questioned. Nor did he ask the judge that he be allowed to approach the bench during these conferences.

¶38. This same issue was addressed in *Chase v. State,* 645 So. 2d 829, 845 (Miss. 1994). In that case, the trial court excused two prospective jurors after off-the-record discussions. Unlike the case at bar, the trial court apparently did not inform the attorneys as to the reasons for their excusal. Chase argued that "this action violated his right to be present during the impaneling of the jury." *Id.* at 845. The *Chase* Court rejected the argument, stating:

> As has been the case in other assignments of error, there was no objection raised at the time of the alleged error. Chase also failed to object to the jurors prior to the jury being impaneled and indicated to the court that he had no objection to the selection of the jury. Since no objection was made, the

issue is not properly preserved for review by this Court.

As noted by the State, another independent basis for rejecting Chase's argument is the failure to preserve an adequate record. In *Hansen v. State,* 592 So. 2d 114, 127 (Miss. 1991), this Court stated: "It is elementary that a party seeking reversal of the judgment of a trial court must present this court with a record adequate to show that an error of reversible proportions has been committed and that the point has been procedurally preserved."

*Chase*, 645 So. 2d at 845.

¶39. As was the situation in *Chase*, Clyde offered no objection to the actions of the trial judge that he now asserts to be reversible error. In fact, defense counsel stated on-the-record that it was alright for the trial court to give the reasons for excusing the prospective jurors at a later time. Furthermore, Clyde made no objection to the final jury panel, nor did he raise this issue in his motion for a new trial. For these reasons, this issue has not been properly preserved for review by this Court.

### III. (21.) THE PROSECUTOR'S SYSTEMATIC USE OF PEREMPTORY CHALLENGES TO EXCLUDE BLACK PERSONS FROM THE JURY IN THIS CASE DEMANDS A REMAND FOR A *BATSON* HEARING.

¶40. Clyde asserts a *Batson* claim for the first time on appeal. The final jury panel of fourteen included nine white and three black jurors and two white alternates. Clyde argues that the final jury makeup bore little demographic resemblance to the community or to the special venire. He maintains that the State systematically used its peremptory challenges to strike black venire persons in violation of the Fourteenth Amendment to the United States Constitution and Article 3 of the Mississippi Constitution without providing sufficient race-neutral reasons for the strikes as required by *Batson v. Kentucky,* 476 U.S. 79 (1986). The State used eleven of its thirteen peremptory challenges against black venirepersons. Clyde concedes that no objection was made in the trial court, but argues that the circumstances of the case warrant a remand to the circuit court for a *Batson* hearing nonetheless.

¶41. In the death penalty case *Conner v. State*, 632 So. 2d 1239, 1264 (Miss. 1993), the appellant complained that the State intentionally struck blacks and women from the jury. The Court refused to address the issue since Conner did not object in the lower court, stating, "[t]his Court has often held that a party waives any and all claims regarding the composition of his jury if he fails to raise an objection before the jury is sworn." *Id.* at 1264. *See also Mack v. State*, 650 So. 2d 1289, 1297 (Miss. 1994); *Shaw v. State*, 540 So. 2d 26, 27 (Miss. 1989); *Thomas v. State*, 517 So. 2d 1285, 1287 (Miss. 1987); *Pickett v. State*, 443 So. 2d 796, 799 (Miss. 1983).

¶42. In the case at bar, Clyde made no objection in the trial court to any of the State's peremptory strikes, he never asked that the State articulate race-neutral reasons for those strikes, nor did he object to the final composition of the jury. For these reasons, this issue is deemed waived for the purposes of this appeal. Furthermore, it should be noted that three blacks did sit on the final jury panel, and during jury selection these three names were put before the State at a time when it still had peremptory challenges remaining which could have been used to strike them from the jury panel.

### GUILT PHASE ISSUES

## IV. (4.) THE TRIAL COURT OVERREACHED ITS AUTHORITY WHEN IT ALLOWED THE DECISION AS TO SEVERANCE TO BE MADE BY THE DEFENDANT AGAINST THE ADVICE OF COUNSEL.

¶43. The attorneys for both Clyde and Jerome filed motions for severance which were granted by the trial court. At a subsequent pre-trial hearing the trial court was informed that, against the advice of their attorneys, both Clyde and Jerome desired to be tried together. After Clyde and Jerome had been thoroughly questioned on the matter, the trial court rescinded the earlier order of severance allowing the brothers to be tried jointly. The trial judge indicated at that time that upon conviction the brothers would be given the option of having the sentencing phase heard separately.

¶44. Clyde now argues that the trial court committed reversible error in allowing him to override the advice of his attorney and in rescinding the order of severance. He contends that whether to ask for a severance is a tactical decision over which the defense attorney and not the defendant has the ultimate control. Furthermore, he argues that under Mississippi law, a defendant in a capital case has an absolute right to a separate trial from that of a co-defendant. To support his argument Clyde cites to Rule 4.04 of the Uniform Criminal Rules of Circuit Court Practice, which provides that "[t]he granting or refusing of severances of defendants in cases not involving the death penalty shall be in the discretion of the trial judge." Clyde states that there is no reported case under Mississippi's modern capital punishment statute involving a multi-defendant trial.

¶45. He argues that in non-capital cases the refusal to grant a severance is reversible error if it prejudices the defendant at trial, *citing*, **Duckworth v. State**, 477 So. 2d 935, 937 (Miss. 1985) and **Price v. State**, 336 So. 2d 1311, 1312 (Miss. 1976). Clyde maintains that such prejudice occurred in the case at bar because only Jerome was identified in a photographic lineup and his presence in the courtroom caused State's witness Kevin Smith to identify him as well. He also argues that he was prejudiced during the sentencing phase when Jerome's attorneys argued that he, Clyde, was more deserving of the death penalty.

¶46. The State suggests that this issue is one of first impression in this State. It is the State's contention that the record shows that Clyde was fully aware of the consequences of being tried with Jerome and still he made that decision. The State maintains that Clyde cannot now complain of a decision or tactic that he personally asserted at trial, and he should be barred from raising this claim on appeal.

¶47. Miss. Code Ann. § 99-15-47 (1994) provides for severance as follows:

> Any of several persons jointly indicted for a felony *may* be tried separately on making application therefor, in capital cases, before the drawing of any special venire which is summoned to appear on the day the case is set for trial and in other cases, before arraignment.

(emphasis added). Nothing in this statute requires that persons jointly indicted for capital murder where the State intends to seek the death penalty must be tried separately. The statute only provides that co-indictees *may* be tried separately, at the trial court's discretion, when a motion for severance is timely filed. It is Rule 4.04 of the Uniform Criminal Rules of Circuit Court Practice which takes this discretion away from the trial court in cases involving the death penalty. Rule 4.04 reads:

> The granting or refusing of severances of defendants in cases not involving the death penalty shall be in the discretion of the trial judge.

The court may, on motion of the state or defendant, grant a severance of offenses whenever:

(1) If before trial it is deemed appropriate to promote a fair determination of the defendant's guilt or innocence of each offense; or

(2) If during trial, upon the consent of the defendant, it is deemed necessary to achieve a fair determination of the defendant's guilt or innocence of each offense.

¶48. This rule does not say that there must be a severance in all cases involving the death penalty, only that if a motion for severance is filed, the trial court has no discretion and instead must grant the requested severance. The Rule does not require the trial court to *sua sponte* grant a severance where there has been no motion for severance filed, especially when the defendant wishes to be tried together with his co-defendant. Clyde provides no authority to support his contention that the trial court should have refused his knowing, informed, and voluntary request to be tried jointly with his brother Jerome. The only Mississippi case found wherein the trial court severed the trials of jointly indicted defendants against the wishes of one of those defendants involves an instance not where both co-defendants were asking to be tried jointly, but where one of the co-defendants was unavailable to stand trial, so instead of continuing the trial as to both defendants, there was a severance. *See **Thompson v. State***, 231 Miss. 624, 97 So. 2d 227 (1957).

¶49. Clyde goes on to make the argument that whether to obtain a severance was a tactical and strategic decision that his attorneys had the right to make and the trial court should not have allowed him to override his attorneys' decision. The problem with this argument is that the trial court did not "allow" Clyde to override his attorneys' decision; rather, the record suggests that his attorneys acceded to Clyde's decision, albeit against their better judgment. Therefore, no absolute right to severance was impinged upon by the trial court. None of the cases cited by Clyde involve a factual situation such as this. Most of the cases he cites involve ineffective assistance of counsel claims wherein the defendant's attorney made certain strategic decisions against the defendant's wishes, such as which witnesses to call.

¶50. The case cited by Clyde which is most closely related factually to the case at bar is ***Blanco v. Singletary***, 943 F.2d 1477 (11th Cir. 1991), wherein the defendant and defense counsel openly disagreed over whether to call two witnesses, and the trial court allowed the defendant and not his attorney to make that decision. The Eleventh Circuit ruled that "[t]he decision as to which witnesses to call is an aspect of trial tactics that is normally entrusted to counsel" and "the trial court overreached its authority" in allowing the defendant to override his lawyer's decision. ***Id.*** at 1495. Again, this case is distinguishable from the case *sub judice*. Here, Clyde's attorneys, although clearly apprehensive about Clyde and Jerome being tried together, did not openly oppose the decision. Instead, they informed the trial court that Clyde wanted the order of severance rescinded. While Clyde's attorneys did state on-the-record that they had thoroughly discussed the matter with Clyde and had advised him against requesting a joint trial, they did not try to discourage the trial court from rescinding the order of severance per the Smith brothers' request.

¶51. Clyde is correct in his argument that a defendant in a capital case has an absolute right to a separate trial from that of a co-defendant, as per Rule 4.04. However, this right, as any other fundamental and absolute right, can be waived. The Supreme Court has held that "although the defendant 'may conduct his own defense ultimately to his own detriment, his choice must be honored. . ..'" ***Dunn v. State***, 693 So. 2d 1333, 1340 (Miss. 1997) (quoting ***Godinez v. Moran***, 509 U.S. 389, 399-400 (1993)). "This Court in ***Metcalf*** [***v. State***, 629 So. 2d 558 (Miss. 1993),] wrote of its displeasure of defendants who would use their right to refuse counsel in an attempt to play a 'cat and mouse' game with the court, or as some strategy

to place the trial judge in a position where 'in moving along the business of the court, the judge appears to be arbitrarily depriving the defendant of Counsel.'" *Dunn*, 693 So. 2d at 1342 (citations ommitted). The case at bar presents the Court once again with a situation where a defendant attempts to manipulate the judicial process. Clyde raises as error his decision to act against the advice of his attorneys by demanding the motion for severance be withdrawn.

¶52. Because Clyde requested a joint trial, he essentially voluntarily made a knowing and informed waiver of his right to a separate trial, and he cannot now complain that his request was granted. This issue is without merit as to the guilt phase.

¶53. This likewise applies to the trial court's decision to allow the sentencing phase to be tried jointly. When it came time for the sentencing phase, the trial court stated that since the exact same aggravating circumstances applied to both Clyde and Jerome, there would be no need for separate sentencing hearings for each brother. Clyde offered no objection to this, and in fact stated he wanted a joint sentencing hearing. Prior to the commencement of the sentencing hearing, the following statements were placed on the record:

> **MR. STUCKEY:** Once again, Your Honor, for and on behalf of Clyde Smith, we have discussed the pros and cons of a joint sentence hearing, and feel that it is in the best interest of Clyde Smith to have separate sentence hearings. We discussed that many times over the last month or so and in particularly the last few days and more in particularly last night because there are some differences between he and his brother that perhaps would work against him at trial if it was a joint sentencing trial, so once again, it is against our better judgment that we conduct a joint sentencing trial. However, as I understand it, Clyde Smith is still of the opinion and desire to have a joint sentencing trial, and I wanted to ask him that on the record so we can make sure that [sic] where we are.

> Clyde, do you still desire and demand a joint sentencing trial?

> **CLYDE SMITH:** Yes.

¶54. Since Clyde affirmatively asked for a joint sentencing hearing, and there was no objection made when the trial court ruled that the sentencing hearing would not be severed, this issue is waived for the purposes of this appeal. *Ballenger*, 667 So. 2d at 1259; *Foster v. State*, 639 So. 2d 1263, 1270 (Miss. 1994); *Mitchell v. State*, 609 So. 2d 416, 422 (Miss. 1992); *Moawad v. State*, 531 So. 2d 632, 635 (Miss. 1988).

¶55. The non-severance of Clyde's trial from Jerome's did not result in prejudice to Clyde based on the overwhelming evidence in the record before this Court. This issue contains no reversible error.

### V. (14.) THE TRIAL COURT SHOULD HAVE EXCLUDED AS EVIDENCE ITEMS DISCOVERED BY LAW ENFORCEMENT OFFICIAL IN A WARRANTLESS SEARCH OF APPELLANTS' CAR, WHICH WAS NOT SUPPORTED BY PROBABLE CAUSE.

¶56. Clyde contends that there was insufficient probable cause for the warrantless search of the abandoned red and white automobile which belonged to Clyde and Jerome's sister; and therefore, the keys to the victim's store, the bandanna, and the sawed-off shotgun found pursuant to that warrantless search should not have been admitted into evidence.

¶57. A suppression hearing was held on this issue prior to trial at which the officers involved in the search

testified. The State asserts that the totality of the circumstances support the trial court's finding that the officers had sufficient probable cause to search the car without first obtaining a warrant.

¶58. There has long been an automobile exception to the warrant requirement where probable cause exists. *See* **McNeal v. State**, 617 So. 2d 999 (Miss. 1993); **Barry v. State**, 406 So. 2d 45, 47 (Miss. 1981); **Hall v. State**, 288 So. 2d 850, 851 (Miss. 1974). Furthermore, "'[a]ny information obtained by means of the eye where no trespass has been committed in aid thereof is not illegally obtained.'" **Franklin v. State**, 587 So. 2d 905, 907 (Miss. 1991) (*quoting* **Patterson v. State**, 413 So. 2d 1036, 1038 (Miss. 1982)). In the case *sub judice*, the trial court found probable cause did in fact exist at the time the officer searched the car the Smith brothers abandoned on the side of the road. This Court must apply the substantial evidence/clearly erroneous standard in determining if there was substantial basis for such a conclusion on behalf of the trial court. **McNeal**, 617 So. 2d at 1007; **Rooks v. State**, 529 So. 2d 546, 554 (Miss. 1988); **Hansen v. State**, 592 So. 2d 114, 126 (Miss. 1991). *See also* **Illinois v. Gates**, 462 U.S. 213, 238-39 (1983).

¶59. In the case *sub judice*, there is more than substantial evidence to support the trial court's finding of probable cause. The officers had just received information that a car fitting the description of the subject car was believed to have been involved in a robbery and murder, and Office Roseman had also received information that two black males in a red and white car "had picked up a young lady and was trying to mess with her." Officer Roseman, who had earlier stopped the brothers, also stated that they were acting suspiciously. Furthermore, when Officer Goad passed the brothers in his patrol car as they were walking away from the red and white car, Clyde and Jerome ran off the road and across a field. And finally, when Officer Goad shined his flashlight in the car looking to see if the keys were in it, he saw the sawed-off shotgun in plain view on the back floorboard. Taking all of this into consideration, we find there was sufficient evidence to support the trial court's finding that the officers had sufficient probable cause to conduct a warrantless search of the vehicle. This issue is without merit.

> **VI. (7.) THE TRIAL COURT VIOLATED MISSISSIPPI LAW, THE EIGHTH AMENDMENT REQUIREMENT OF RELIABILITY IN CAPITAL SENTENCING AND THE FOURTEENTH AMENDMENT OF DUE PROCESS AND RIGHT TO CONFRONT WITNESSES BY ADMITTING EVIDENCE OF CRIMES OTHER THAN THOSE FOR WHICH CLYDE SMITH WAS ON TRIAL.**
>
> **VI(A). (7(A)) THE TRIAL COURT ERRED IN OVERRULING DEFENDANT'S OBJECTION TO OTHER CRIMES EVIDENCE PRESENTED BY THE WITNESS CAROLYN PEARCE.**
>
> **VI(B). (7(B)) THE TRIAL COURT ERRED IN PERMITTING THE INTRODUCTION OF THE KNIFE WHERE IT WAS NOT SHOWN TO HAVE ANY RELATION TO THE OFFENSE.**[5]

¶60. In this issue, Clyde complains of the introduction of "other crimes" evidence by the State, namely, evidence of an assault on Carolyn Pearce with both a gun and a knife; that Clyde had in his possession a knife both before and after the murder; and, that a sawed-off shotgun was found in the red and white automobile "abandoned" by Clyde and Jerome. He also maintains that he was improperly restricted in his cross-examination of Carolyn Pearce.

¶61. The State maintains that all of these claims are either barred or totally without merit.

¶62. Clyde asserts that the trial court committed reversible error in allowing Carolyn Pearce to testify that the Smith brothers assaulted her with both a knife and a pistol. He takes exception to both the testimony of the assault and to the introduction of the knife into evidence. Clyde argues that there was never any allegation that a knife was used by the person or persons who murdered Johnny Smith, but rather all the testimony indicated that he died from multiple gunshot wounds consistent with a .38 caliber weapon. It is his contention that since no pistol was ever recovered, there was no connection made between the gun Carolyn Pearce saw and the murder weapon. Therefore, he argues, the introduction of an assault on Carolyn Pearce by the Smith brothers was error as it meets none of the exceptions to the exclusion of other crimes evidence under Rule 404 (b) of the Mississippi Rule of Evidence.

¶63. At no point during the trial did Clyde object to the introduction of testimony concerning the knife or the revolver, or to the introduction of the knife into evidence. Accordingly, this claim has been waived and may not be raised for the first time on appeal. "A trial judge will not be found in error on a matter not presented to him for decision." *Jones v. State*, 606 So. 2d 1051, 1058 (Miss. 1992) (citing *Crenshaw v. State*, 520 So. 2d 131, 134 (Miss. 1988). *See also* *Ballenger*, 667 So. 2d at 1259; *Foster v. State*, 639 So. 2d 1263, 1270 (Miss. 1994); *Mitchell v. State*, 609 So. 2d 416, 422 (Miss. 1992).

¶64. This issue also fails on the merits. Clyde gives no reason why the testimony concerning the knife and revolver or the introduction of the knife itself was error, other than to say no connection was ever made between them and the murder. Apparently, this is a relevancy argument. The testimony concerning both was extremely relevant, the knife to show that Clyde was armed on the night of the murder, but especially that concerning the revolver. According to testimony, the projectiles recovered from Johnny Smith's body and the liquor store were consistent with a .38 caliber revolver. Therefore, the testimony of Henry Bryant and Carolyn Pearce was relevant to show that Jerome, and at one point Clyde, was in possession of a revolver both a few hours before and a few hours after the murder.

¶65. Next in this issue, Clyde argues that the testimony of Carolyn Pearce that the Smith brothers assaulted her was inadmissible other crimes evidence. The only testimony of any assault was when Pearce testified that Jerome hit her on the wrist with a big silver revolver, that Clyde put a knife to her throat, and that after he and Jerome exchanged weapons Clyde pulled the gun on her and made her take her clothes off and get out of the car.[6] During this testimony, Carolyn identified the knife recovered by the police in the field near the brothers' abandoned car and the knife was placed into evidence.

¶66. Clyde correctly points out that, as a general rule, evidence of a crime other than the one for which the accused is being tried is not admissible. *Ladner v. State*, 584 So. 2d 743, 758 (Miss.), *cert. denied*, 502 U.S. 1015 (1991); *Rose v. State*, 556 So. 2d 728 (Miss. 1990). There are exceptions. M.R.E. 404(b) provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

¶67. In accordance with Rule 404(b), this Court has consistently held the admission of evidence of unrelated crimes for the purpose of showing the accused acted in conformity therewith to be reversible

error. ***Parker v. State***, 606 So. 2d 1132, 1136 (Miss. 1992) (citing ***Rose***, 556 So. 2d at 731; ***Houston v. State***, 531 So. 2d 598, 605 (Miss. 1988)). That was not the purpose for the introduction of such evidence in the case at bar. As the State argues in its brief, any testimony concerning an assault was allowed to explain how Pearce was able to identify the knife and revolver. The reason for such testimony was to show that Clyde and Jerome were in possession of a knife and a revolver (the possible murder weapon) shortly after the murder. This testimony corroborates that of Henry Bryant that the brothers were in possession of a knife and revolver prior to the murder.

¶68. The testimony was therefore admissible under Rule 404(b) as to opportunity, preparation, plan, knowledge, and identity. It also passes muster under Rule 403 as being more probative than prejudicial. This issue is without merit.

### VI(C). (7(C)) THE TRIAL COURT ERRED IN RULING THAT THE DEFENSE COULD NOT IMPEACH CAROLYN PEARCE WITHOUT OPENING THE DOOR TO THE RAPE DENIED CLYDE SMITH HIS RIGHT TO CONFRONTATION.

¶69. Clyde contends his constitutional right to confrontation was violated when the trial court refused to allow him to cross-examine Carolyn Pearce with regard to the fact that she was a prostitute and cocaine addict. He argues that as a result of this ruling, neither defendant chose to cross-examine Pearce, therefore, it was not conveyed to the jury that Pearce was not a credible witness.

¶70. Clyde misrepresents the trial court's ruling on this matter. The trial court never told the defense they could not question Pearce concerning these issues. The record reflects what actually transpired:

> **MR. CROOK**: Okay. That's--what about an assault? They forced her to go from one place that she was wanting--Judge, she's a hooker is what she is.
>
> **THE COURT**: I understand that.
>
> **MR. CROOK**: And a [crack] addict, and of course they're going to tear her up on that, but that's, you know--
>
> **THE COURT**: Well, now, if they open the door about her being a hooker, they done opened the damn door for all sorts of things. That's up to them.
>
> **MR. STUCKEY**: I think we understand that, Judge.
>
> **MR. GANDY**: We understand.
>
> **THE COURT**: That's up to them whether they want to do that or not.

¶71. As the record shows, the trial judge did not limit Clyde's right to cross-examine Pearce, he merely pointed out that it probably would not have been in Clyde's best interest to bring out her profession, as it could possibly open the door to testimony concerning the rape which the trial court took pains to keep out of evidence. For the most part it was the prosecutor asking the trial judge what was admissible, and at no time did the defense make an objection concerning a confrontation clause violation. This issue is therefore without merit and procedurally barred. ***Ballenger***, 667 So. 2d at 1259; ***Foster***, 639 So. 2d at 1270; ***Mitchell***, 609 So. 2d at 422; ***Moawad***, 531 So. 2d at 635.

## VI(D). (7(D)) TESTIMONY THAT A SAWED-OFF SHOTGUN WAS RECOVERED FROM THE SMITH'S CAR WAS ERROR.

¶72. On direct examination, State's witness Deputy Tim Goad testified that a .410 sawed-off shotgun was taken from the car driven by the Smith brothers. The defense objected and the shotgun itself was not introduced into evidence. Clyde argues here that the testimony was error under Rule 404(b) of the Mississippi Rules of Evidence since there was no evidence that the shotgun had any connection with the crime for which the defendants were on trial and the possession of the shotgun itself was a crime.

¶73. During direct examination Deputy Tim Goad testified as follows:

A. I approached the vehicle and shined my flashlight on the inside of the car seeing if the keys were in it, anything like that. The keys were not in the car in the ignition. I shined in the black [sic] floorboard and saw a sawed-off .410, single-shot shotgun laying [sic] in the back floorboard on the driver's side.

Q. All right. And did you take that shotgun into custody?

A. Yes, sir, I did.

At this point, Clyde objected on the grounds of relevancy as to any testimony concerning the shotgun or to its introduction into evidence. After a bench conference out of the presence of the jury, the trial court sustained the objection. The only other mention of the shotgun was a casual reference later during Deputy Goad's direct testimony, where he stated, "These are the keys I found stuck down in the seat on the red and white Ford same time I recovered the shotgun." Clyde made no objection to this statement.

¶74. It should first be pointed out that the trial court sustained Clyde's objection as to the testimony and introduction of the sawed-off shotgun. *Foster v. State*, 639 So. 2d at 1282, is instructive on this issue. In that case an accessory to the murder for which Foster was being tried commented while testifying that he and Foster had stolen a pizza in the past, a clear reference to another bad act or crime. On appeal, Foster argued that the comments were prejudicial and constituted reversible error. This Court rejected the argument stating:

Foster neither requested that the trial court admonish the jury to disregard the testimony, nor requested a mistrial. His only objection was sustained. We are of the opinion that any error created by Harris' unresponsive remark was effectively cured when the trial judge sustained Foster's objection.

*Foster,* 639 So.2d at 1282. *See also **Walker v. State,*** 671 So.2d 581 (Miss. 1995). A similar scenario exists here. Deputy Goad made an improper comment, and Clyde's objection was sustained, but he "neither requested that the trial court admonish the jury to disregard the testimony, nor requested a mistrial." ***Foster***, 639 So.2d at 1282. We find this issue to be without merit.

¶75. Furthermore, on appeal Clyde argues that Deputy Goad's testimony is reversible as inadmissible other crimes evidence since it is illegal to possess a sawed-off shotgun. At trial Clyde only objected to the testimony on the ground of relevancy. "'The assertion on appeal of grounds for an objection which was not the assertion at trial is not an issue properly preserved on appeal.'" ***Ballenger***, 667 So. 2d at 1256 (quoting ***Haddox v. State***, 636 So. 2d 1229,1240 (Miss. 1994)); *See also **Baine v. State***, 606 So. 2d 1076 (Miss. 1992); M.R.E. 103. Therefore, this issue is both procedurally barred and without merit.

## VII. (8.) THE TRIAL COURT ERRED IN ALLOWING THE STATE TO CALL A WITNESS PREVIOUSLY UNDISCLOSED TO THE DEFENSE UNDER THE GUISE OF "REBUTTAL" TESTIMONY.

¶76. During its case-in-chief the State attempted to call Jerry Smith, a Leflore County deputy and the victim's brother, as a witness. The defense objected because it had not been previously notified that he might be a witness or of the nature of his testimony. A bench conference was held out of the presence of the jury and the trial court allowed the State to make a record as to what Deputy Smith's testimony would be if allowed to testify. The trial court concluded that it would be error to allow Deputy Smith to testify since his name had not been provided to the defense during discovery as a possible witness for the State.

¶77. Pursuant to the decision of the trial judge, Deputy Smith did not testify during the State's case-in-chief. However, the trial court allowed the State to call Deputy Smith as a rebuttal witness after Clyde put on several witnesses in an attempt to establish an alibi defense. On rebuttal, Deputy Smith testified that as he was patrolling Sidon on the night of the murder, he saw a red and white car with a rusted spot near the exhaust pipe and a transmission leak parked near the scene of the crime shortly before the shooting. Deputy Smith stated that he later identified the car he saw that night as being the same one Clyde and Jerome abandoned on the side of the road and which was later impounded. At trial he also identified a picture of the car driven by the Smith brothers that night as the same one he saw near the scene of the murder.

¶78. On appeal Clyde argues that the testimony of Deputy Smith was not proper rebuttal evidence of the alibi defense, but rather just an attempt to get around the discovery violation of Rule 4.06 of the Uniform Criminal Rules of Circuit Court Practice.[7]

¶79. The State argues that Deputy Smith's testimony was proper rebuttal evidence, and that pursuant to Rule 4.07 of the Uniform Criminal Rules of Circuit Court Practice[8] the State is not required to give notice of its rebuttal witnesses unless it demands in writing the names of the defense's alibi witnesses. The State maintains that since it made no such request for the names of Clyde's alibi witnesses it had no duty to give notice of its rebuttal witnesses.

¶80. The law is clear that the State has no duty to provide the defense with the names of possible rebuttal witnesses unless the State has requested notice of alibi defense. ***Deal v. State***, 589 So. 2d 1257, 1259 (Miss. 1991). *See also* Unif.Crim.R.Cir.Ct.Prac. 4.07. Such was the case here. The fact that the State first tried to put Deputy Smith on the stand during its case-in-chief has no bearing on this rule since the trial court properly refused to allow his testimony at that time.

¶81. It is a different question entirely whether Deputy Smith's testimony was proper rebuttal. Clyde suggests that it was not. We disagree. Clyde and Jerome presented a two-pronged alibi defense. First, they offered witnesses who placed the brothers in Belzoni at the approximate time the shooting occurred in Sidon. Second, they had another witness who placed them in Isola approximately an hour after the murder, the theory being they would not have had time to commit the murder in Sidon and still be able get to Isola by the time they were seen there.

¶82. The testimony of Deputy Smith was appropriate rebuttal evidence to this testimony. It was uncontroverted that Clyde and Jerome were driving their sister's red and white Ford car on the night of the murder. Deputy Smith, in contradiction of the alibi testimony, stated that he saw a red and white car parked near the Sidon Liquor Store minutes before the robbery and murder. Deputy Smith identified photographs

of the car the Smith brothers were driving on the night of the murder as the same car he had seen parked near the scene. He also testified that he identified the car in person after it had been impounded by the authorities.

¶83. "The determination of whether evidence is properly admitted as rebuttal evidence i s within the trial court's discretion." **Powell v. State**, 662 So. 2d 1095, 1099 (Miss. 1995) (citing **Wakefield v. Puckett**, 584 So. 2d 1266, 1268 (Miss. 1991)). The trial judge did not abuse this discretion in allowing Deputy Smith to testify in rebuttal after refusing to allow him to testify during the State's case-in-chief.

### VIII. (17.) THE GUILT PHASE INSTRUCTIONS IN THIS CASE VIOLATED STATED LAW AND DEPRIVED THE DEFENDANT OF FUNDAMENTAL FAIRNESS AND DUE PROCESS OF LAW.

¶84. Here, Clyde takes issue with several portions of the trial court's guilt phase instruction C-CR-3. Instruction C-CR-3 reads in pertinent part as follows:

> The Court instructs the Jury that each person present at the time and consenting to and encouraging the commission of a crime, and knowingly, wilfully and feloniously doing any act which is an element of the crime, or immediately connected with it, or leading to its commission, is as much principal as if he had, with his own hand, committed the whole offense.
>
> . . . .
>
> If you believe from the evidence beyond a reasonable doubt and to the exclusion of every reasonable hypothesis consistent with innocence, that on the day testified about, the Defendant, Clyde Wendell Smith, either individually or acting in concert with one other or others, did unlawfully, wilfully and feloniously kill and murder Johnny B. Smith, a human being, at a time when Clyde Wendell Smith was engaged in the commission of the crime of Armed Robbery by unlawfully, wilfully and feloniously putting Johnny B. Smith in fear of immediate injury to his person by the exhibition of a firearm, a deadly weapon, and by taking money belonging to Johnny B. Smith from his person or from his presence and against his will, then it is your sworn duty to find Clyde Wendell Smith guilty of Capital Murder.

### (A). JUDGE EVANS'S INSTRUCTION ON THE ROBBERY PRONG OF CAPITAL MURDER FAILED TO INFORM JURORS OF THE NECESSARY CAUSE-AND-EFFECT CONNECTION BETWEEN THE "PUTTING IN FEAR" AND THE "TAKING" ELEMENTS OF THIS OFFENSE.

¶85. First, Clyde contends that the jury was improperly instructed on the elements of robbery. He maintains the instruction failed to inform the jury that armed robbery may be established by proof that the defendant took property by violence to the victim's person, and instead only mentioned the "putting in fear" element of robbery. He claims that although the instruction noted the "putting in fear" element of robbery, it neglected to explain "that the state, in order to prove the elements of robbery, must show that '[i]f putting in fear is relied upon, it must be the fear under duress of which the owner parts with possession.'" **Jones v. State**, 567 So. 2d 1189, 1192 (Miss. 1990) (*quoting* **Crocker v. State**, 272 So. 2d 664, 665 (Miss. 1973)).

¶86. It is Clyde's contention that the evidence clearly showed that the victim died within seconds of being shot, and that only after the shooting did the assailant or assailants remove the cash register and spare cash

drawer from the store. He argues that since the evidence showed that victim was already dead before anything was taken from the store the robbery could not have occurred by putting him under the duress of any fear of injury.

¶87. Clyde made no objection to the robbery portion of the instruction in the trial court. The failure to make a contemporaneous objection waives this issue for the purposes of appeal. "A trial judge will not be found in error on a matter not presented to him for decision." *Jones v. State*, 606 So. 2d 1051, 1058 (Miss. 1992) (citing *Crenshaw v. State*, 520 So. 2d 131, 134 (Miss. 1988); *Howard v. State*, 507 So. 2d 58, 63 (Miss. 1987)). *See also Ballenger*, 667 So. 2d at 1259; *Foster*, 639 So. 2d at 1270; *Mitchell*, 609 So. 2d at 422; *Moawad*, 531 So. 2d at 635.

¶88. This issue is also without merit. Any error in not instructing the jury that armed robbery may be established by proof that the defendant took property "by violence to the person" was, at most, harmless. Since there were no eye-witnesses to the murder, it is possible to theorize that one or both of the Smith brothers took the cash register or extra cash drawer while the victim was still alive by putting him in fear of immediate injury to his person, and the victim was only shot afterward while one or both of the brothers were exiting the scene. The evidence presented at trial would just as easily support this scenario as any other. Therefore, the facts could support the instruction given. Accordingly, this issue is without merit.

### (B). JUDGE EVANS'S CHARGE ON THE ELEMENTS OF CAPITAL MURDER IMPROPERLY AMENDED THE INDICTMENT BY OMITTING THE ELEMENT OF "MALICE AFORETHOUGHT."

¶89. Clyde asserts that the trial court committed reversible error by constructively amending the indictment through its instructions to the jury. The indictment in this case charged that Clyde and Jerome

> unlawfully, willfully, feloniously, and of their malice aforethought, did, then and there, kill and murder one Johnny Smith, a human being, said murder being done while Jerome Smith and Clyde Wendell Smith were engaged in the commission of the crime of Armed Robbery as defined in Section 97-3-79 of the Mississippi Code of 1972 as amended, of Johnny Smith in violation of Section 97-3-19(2)(e) of the Mississippi Code of 1972, as amended[.]

¶90. Clyde states that the lower court's instruction to the jury made no mention of the malice element of the indictment, instead charging that Clyde Smith should be found guilty of capital murder if the jurors determined that he "did unlawfully, willfully and feloniously kill and murder" the victim during the commission of an armed robbery. According to Clyde, this omission was highly prejudicial, as it essentially transformed the instruction into one on felony-murder, a wholly different crime than the intentional murder charged in the indictment. To support his argument that it is reversible error to instruct the jury on a crime different than that charged in the indictment, Clyde cites a number of cases including *Rhymes v. State*, 638 So. 2d 1270, 1275-76 (Miss. 1994); *Baine v. State*, 604 So. 2d 258, 260 (Miss. 1992); *Thomas v. Harrelson*, 942 F.2d 1530, 1531 (11th Cir. 1991); *Quick v. State*, 569 So. 2d 1197, 1199 (Miss. 1990); *Griffin v. State*, 540 So. 2d 17, 19 (Miss. 1989); and *United States v. Zingaro*, 858 F.2d 94, 98-99 (2d Cir. 1988). Clyde states that this Court has frequently ordered a new trial where the circuit judge gave an inadequate instruction or no instruction at all on malice, although it was an element of the charged offense, *citing, Nicolaou v. State*, 534 So. 2d 168 (Miss. 1988); *Cooley v. State*, 346 So. 2d 912 (Miss. 1977) ; and *Newell v. State*, 308 So. 2d 71 (Miss. 1975).

¶91. This assignment must fail for several reasons, the first being it is procedurally barred. The portion of Instruction C-CR-3 that concerns us here reads as follows:

> If the State has failed to prove beyond a reasonable doubt and to the exclusion of every reasonable hypothesis consistent with innocence that the Defendant, Clyde Wendell Smith, either individually or acting in concert with one other or others did wilfully, without authority of law, and *with deliberate design to effect death*, kill Johnny Smith, a living person, by shooting him, at a time when Clyde Wendell Smith was engaged in the commission of the crime of robbery, then you shall find the Defendant not guilty of Capital Murder.

(emphasis added).

¶92. When this instruction was submitted to the trial court it read "with or without deliberate design." During the discussion of the jury instructions, Clyde's attorneys asked that in order to conform with the malice aforethought portion of the indictment the word "without" be stricken so that the instruction would read "with deliberate design." The amendment was made and the instruction was accepted by Clyde. Since Clyde accepted the instruction as amended, he has waived any claim of error. *See Ballenger*, 667 So. 2d at 1267; *Foster*, 639 So.2d at 1270.

¶93. Furthermore, defense counsel was correct at trial when he stated that amending the instruction to read "with deliberate design" would make the instruction conform with the malice aforethought language used in the indictment. This is so since "[i]t has long been the case law of this state that malice aforethought, premeditated design, and deliberate design all mean the same thing." *Windham v. State*, 602 So. 2d 798, 801 (Miss. 1992) (quoting *Johnson v. State*, 475 So. 2d 1136, 1139 (Miss. 1985)).

¶94. Finally, Clyde was indicted for capital murder pursuant to Miss. Code Ann. § 97-3-19(2)(e) which does not require "any intent to kill when a person is slain during the course of a robbery." *Griffin v. State*, 557 So. 2d 542, 549 (Miss. 1990). In *Berry v. State*, 575 So. 2d 1, 13 (Miss. 1990), the defendant made a similar argument as Clyde makes here and the argument was rejected by this Court.

¶95. For the foregoing reasons, this issue is both procedurally barred and without merit.

### (C). THE COURT'S INVITATION TO THE JURORS TO FIND CLYDE SMITH GUILTY OF CAPITAL MURDER ON THE BASIS OF ANY SINGLE ACT "CONNECTED WITH" THE CHARGED OFFENSE ERRONEOUSLY RELIEVED THE STATE OF ITS BURDEN OF PROOF.

¶96. Clyde next complains that instruction C-CR-3 allowed the jury to find him guilty of capital murder under a theory of accomplice liability if it determined that he committed "any act which is an element of the crime or immediately connected with it or leading to its commission[.]" Clyde argues that the instruction allowed the jury to convict him of capital murder, in violation of Mississippi law,[9] even if the jury found he was merely an accessory after the fact. Clyde gives the example that if he only helped dispose of the cash register or money stolen from the store, but had no idea a robbery was going to occur, the instruction still allowed him to be found guilty of capital murder. Clyde argues that the trial court's use of the phrase, "immediately connected," allowed for just such an occurrence.

¶97. First, this issue is procedurally barred for failure to raise it in the trial court. *Ballenger*, 667 So. 2d at 1259; *Foster*, 639 So.2d at 1270; *Mitchell*, 609 So. 2d at 422. This issue is also without merit. The

portion of Instruction C-CR-3 to which Clyde is objecting to here actually reads as follows:

> The Court instructs the Jury that each person present at the time and consenting to and encouraging the commission of a crime, and knowingly, wilfully and feloniously doing any act which is an element of the crime, or immediately connected with it, or leading to its commission, is as much a principal as if he had, with his own hand, committed the whole offense.

This instruction clearly informs the jury that to be found guilty under a theory of accomplice liability, the defendant had to be present at the time of the crime, consenting and encouraging its commission. This precludes the jury from finding Clyde guilty of capital murder if he was only an accessory after the fact. Furthermore, an identical instruction was upheld by this Court in *Carr v. State*, 655 So. 2d 824 (Miss. 1995), stating:

> He argues that the language of S-5 creates a conclusive presumption that the jury only had to find that Carr performed an act connected with the crime, and not that he intended to commit the crime, to find him guilty of the underlying felony.

> In *Simmons v. State*, 568 So. 2d 1192 (Miss. 1990), this Court upheld a similar jury instruction, which was challenged because it did not require that the jury find beyond a reasonable doubt that the defendant had committed every element of the crime.

> We find that jury instruction S-5 sufficiently instructed the jurors on the element of intent. Furthermore, when read in the context of the jury charge as a whole, S-5 correctly placed the burden on the State to prove beyond a reasonable doubt every element of the underlying felonies with which Carr was charged.

*Carr*, 665 So. 2d at 833. Accordingly, this issue is procedurally barred and without merit.

### IX. (18.) THE FAILURE OF THE STATE TO ADEQUATELY PRESERVE THE CHAIN-OF-CUSTODY OF SEVERAL KEY EXHIBITS VIOLATED STATE LAW AND THE FOURTEENTH AMENDMENT.

¶98. Clyde asserts that the State did not properly establish through testimony the chains-of custody for a number of exhibits introduced at trial. He argues that because of this failure on the part of the State, the sack and liquor bottle with Jerome's fingerprint, the keys to the victim's store, the bandanna, the bullets, the cash register tape, and the receipt from Burger King were all improperly admitted into evidence, thus requiring reversal. The State points out that no objection was made at trial on this basis and therefore this issue should be deemed waived.

¶99. At no time during trial or in his motion for new trial did Clyde object to the admission of this evidence on the basis of the State's failure to sufficiently establish the chain of custody. In fact, most of the evidence was admitted without any objection. The failure to make a contemporaneous objection bars Clyde from raising this issue for the first time on appeal. "A trial judge will not be found in error on a matter not presented to him for decision." *Jones*, 606 So. 2d at 1058; *See also Ballenger*, 667 So. 2d at 1259; *Foster*, 639 So. 2d at 1270; *Mitchell*, 609 So. 2d at 422; *Moawad*, 531 So. 2d at 635. In those instances where there was an objection made to the introduction of evidence, it was on different grounds. "'The assertion on appeal of grounds for an objection which was not the assertion at trial is not an issue properly preserved on appeal.'" *Ballenger*, 667 So. 2d at 1256 (quoting *Haddox*, 636 So. 2d at 1240);

*See also **Baine v. State,*** 606 So. 2d 1076 (Miss. 1992); *See* M.R.E. 103; Unif.Crim.R.Cir.Ct.Prac. 5.03.

¶100. Furthermore, "[t]his Court has held that the test with respect to whether there has been a break in the chain of custody of evidence is whether there is an indication of probable tampering." ***Nalls v. State***, 651 So. 2d 1074, 1077 (Miss. 1995); ***Wells v. State***, 604 So. 2d 271, 277 (Miss. 1992). "[M]atters regarding the chain of custody of evidence are largely left to the discretion of the trial judge and will not be disturbed unless there appears to be an abuse of discretion." ***Nalls***, 651 So. 2d at 1077; ***Wells***, 604 So. 2d at 277; ***Nix v. State***, 276 So. 2d 652 (Miss. 1973).

¶101. The record reflects that the State sufficiently set out the chains of custody, and there is no evidence in this case that suggests that any of the items introduced into evidence by the State were tampered with in any way. Thus, this issue is not only procedurally barred, it is also without merit.

## X. (19.) IDENTIFICATION OF THE DEFENDANT AND OF THE RED-AND-WHITE AUTOMOBILE VIOLATED STATE LAW AND THE FEDERAL CONSTITUTION.

¶102. In this issue, Clyde challenges the testimony of several witnesses identifying Clyde or the car being driven by Jerome and Clyde as being outside the liquor store shortly before the murder. Clyde argues that these in-court identifications were highly suggestive and unreliable since no other persons or photographs of other automobiles were presented to the witnesses for comparison purposes to ensure the accuracy of the identifications. Clyde particularly objects to his in-court identification by Kevin Smith since that witness failed to pick him out in an earlier photographic lineup.

¶103. The State asserts that this issue is procedurally barred as having been waived by the failure of the defense to make any objections to these identifications in the trial court.

¶104. At no time during any of the testimony referenced by Clyde, did he make any objection to the identification procedures involved, nor did he interject any objection at all. In fact, the only objection he made to any of the identification testimony was during that of the State's rebuttal witness, Deputy Jerry Smith.[(10)] The other witnesses Clyde cites to by page number merely described the car they saw that night. Deputy Smith was asked to identify photographs of the car he saw parked near the scene on the night of the murder. The defense objected to the introduction of these photographs on the basis of improper predicate. The objection was overruled and no other objection was made to the introduction of the photographs.[(11)]

¶105. Clyde found most egregious the testimony of Kevin Smith, the victim's son, identifying Clyde at trial as one of the men he saw in front of the liquor store just minutes before the murder. Clyde objects to Kevin's in-court identification since he had earlier failed to identify Clyde during a photographic line-up. Again, Clyde failed to object to this testimony at trial. Furthermore, he was given sufficient opportunity to impeach the credibility of the in-court identification. The fact that Kevin picked Jerome out of the photographic line-up, but not Clyde was brought out during the cross-examination of both Kevin and Deputy Jimmy Tindall, the officer who administered the line-up.

¶106. The failure to make a contemporaneous objection bars Clyde from raising this issue for the first time on appeal. "A trial judge will not be found in error on a matter not presented to him for decision." ***Jones***, 606 So. 2d at 1058. Furthermore, "'[t]he assertion on appeal of grounds for an objection which was not the assertion at trial is not an issue properly preserved on appeal.'" ***Ballenger***, 667 So. 2d at 1256 (quoting

*Haddox v. State*, 636 So. 2d 1229,1240 (Miss. 1994)); *See also* **Baine v. State**, 606 So. 2d 1076 (Miss. 1992).

### XI. (20.) THE PROSECUTOR'S CLOSING ARGUMENT AT THE GUILT PHASE INCLUDED VIOLATIONS OF STATE LAW AND THE EIGHTH AND FOURTEENTH AMENDMENTS AND REQUIRE REVERSAL.

¶107. Clyde argues that two statements made by the district attorney in the State's rebuttal during the guilt phase closing arguments amounted to prosecutorial misconduct. Clyde maintains that the following comments were so prejudicial to the defense to amount to reversible error:

Don't convict on circumstantial evidence? Ladies and gentlemen, there are convictions every day in this country. There is not one bit of difference--you didn't hear Judge Evans tell you, "Oh, wait a minute now. Circumstantial evidence, that ain't quite as good as"--he can't tell you that because that's not the law. In fact, Ted Bundy was convicted on circumstantial evidence. Some of you may know who he was. But the circumstantial evidence that they had on Ted Bundy was a bite mark and that's all. Nobody saw him do it. Same thing with fingerprint. Fingerprint's circumstantial. The Crime Lab man didn't see him put his finger on there. Same thing. No.

Now the sheriff testified that it would take 30, 35, 40 minutes, maybe, to go from Sidon to Isola. They want you to believe that you can't do that. I live in Silver City, which is six or seven miles below Belzoni, and from my driveway to this parking lot is 42 miles. If I leave home at 7 o'clock and I'm not going to tell you how fast I go, but if leave home at 7 o'clock, I'm here in the courthouse about 5 or 10 minutes till 8:00. Now where does that put you?

¶108. Clyde sets out the following reasons as to why these statements by the State should be cause for reversal despite the lack of contemporaneous objection: (1) Both of these statements were highly prejudicial and improperly referred to matters that were not in evidence, *citing*, **Balfour v. State**, 598 So. 2d 731, 748-49 (Miss. 1992) and **Smith v. State**, 499 So. 2d 750, 756-57 (Miss. 1986);[12] (2) Courts have condemned prosecutorial arguments that vilify the defendant or compare the accused to other notorious criminals;[13] (3) The "Ted Bundy" argument improperly suggested that the jury look at the limited amount of evidence that it took for a conviction in that case and use that as the legal standard for determining how much proof was sufficient for a conviction in the case at bar;[14] (4) The prosecutor improperly injected his own personal experience, expertise or knowledge about driving times in the area in trying to discredit Clyde's alibi defense.[15]

¶109. Clyde also takes exception to the district attorney's comments concerning the victim's family and work history as well as other aspects of the victim's "worth." He states that these comments improperly misled the jury from the single relevant issue at that stage of the proceeding, whether Clyde and Jerome had murdered Johnny Smith.

¶110. The State correctly points out that the defense made no contemporaneous objections to any of the comments Clyde now complains were improper and prejudicial. Once again the State urges this Court to apply a procedural bar for this reason.

¶111. As stated several times before, since no contemporaneous objection was made, this issue was not properly preserved for appeal. **Ballenger**, 667 So. 2d at 1259.

¶112. Procedural bar notwithstanding, this issue is without merit. This Court in ***Ahmad v. State***, 603 So. 2d 843 (Miss. 1992), stated:

> Generally, attorneys on both sides in a criminal prosecution are given broad latitude during closing arguments. *See **Neal v. State***, 451 So. 2d 743 (Miss. 1984), *cert. denied* 469 U.S. 1098, 105 S. Ct. 607, 83 L. Ed. 2d 716 (1984); ***Bullock v. State***, 391 So. 2d 601 (Miss. 1980), *cert. denied* 452 U.S. 931, 101 S. Ct. 3068, 69 L. Ed. 2d 432 (1981). This Court has explained that not only should the State and defense counsel be given wide latitude in their arguments to the jury, but the court should also be very careful in limiting free play of ideas, imagery, and personalities of counsel in their argument to jury. *See **Johnson v. State***, 477 So. 2d 196 (Miss. 1985), *cert. denied* 476 U.S. 1109, 106 S. Ct. 1958, 90 L. Ed. 2d 366 (1986), *reh'g denied* 476 U.S. 1189, 106 S. Ct. 2930, 91 L. Ed. 2d 557 (1986). Given the latitude afforded an attorney during closing argument, any allegedly improper prosecutorial comment must be considered in context, considering the circumstances of the case, when deciding on their propriety. *See **U.S. v. Bright***, 630 F.2d 804 (5th Cir. 1980); ***U.S. v. Austin***, 585 F.2d 1271 (5th Cir. 1978).

*Ahmad*, 603 So. 2d at 846. In ***Ahmad***, the appellant was convicted of felonious child abuse. During closing arguments the prosecutor made references to hostages and prisoners of war. This Court held:

> Remembering the wide latitude afforded prosecutors in closing arguments, the comments by the State when arguing for a conviction of Abdusabr Ahmad were not improper. Taken in context, the referral to prisoners of war was part of the free play of ideas, imagery, and personalities allowed in closing arguments. The referral to prisoners and hostages does not vilify Abdusabr Ahmad. It is a characterization of I.A.'s position on the day in question. It is not name-calling or a label on Abdusabr Ahmad's overall character. The State did not state per se that Abdusabr Ahmad was an Arab captor. The State did not even compare Abdusabr Ahmad to Arab captors. The State simply compared I.A.'s emotions to that of a prisoner of war or hostage.

*Ahmad*, 603 So. 2d at 846. *See also **Ballenger***, 667 So. 2d at 1269-70.

¶113. In ***Ballenger***, the prosecutor compared the defendant's participation in the crime to that of Charles Manson. This Court held that "[c]onsidering the wide latitude given to attorneys on closing arguments it can not be said that these comments were so improper as to require reversal." ***Id.*** at 1270. As was the case in ***Ballenger***, the prosecutor never called Clyde names or personally vilified him. Unlike ***Ballenger***, Clyde's participation in the murder was not compared to that of a notorious criminal. Ted Bundy's name was only mentioned in the context of showing that cases have been decided on circumstantial evidence.

¶114. Given the wide latitude generally afforded counsel in closing argument, taken together with Clyde's failure to object to any of the comments he now complains of, this claim must fail. *See **Hansen v. State***, 592 So. 2d 114, 139-40 (Miss. 1991); ***Johnson v. State***, 416 So. 2d 383, 392 (Miss. 1982); ***Gray v. State***, 351 So. 2d 1342, 1346-47 (Miss. 1977).

¶115. Lastly in this issue, Clyde asserts that the prosecutor urged the jurors to impose a death sentence because it was important to the victim's wife and son that his life not be reduced to numbers and the town they live in not be reduced to a model. He maintains that these comments were extremely prejudicial and highly improper.

¶116. As with the prosecutor's comments Clyde complained of above, he made no contemporaneous objection to these statements by the State. Furthermore, Clyde takes these comments out of context. Without ever having mentioned the death penalty, the prosecutor made the following comment:

> It's important to Jeanette Smith and Kevin Smith because, as you know and as you see now, their husband and father's life as it is and was is not reduced to numbers called S-1, S-2, S-5, S-12 and the town that they lived in is now reduced to a model,[(16)] which is designed to represent the place where Johnny Smith lost his life.

Nowhere does the prosecutor encourage the jury to impose the death penalty because it is important to the victim's survivors. Instead, the prosecutor points out to the jury that the case involves real people not just exhibits. Again, given the wide latitude generally afforded counsel in closing argument, taken together with the failure to object, this claim must fail. *See **Hansen***, 592 So. 2d at 139-40; Johnson, 416 So.2d at 392; ***Gray***, 351 So. 2d at 1346-47.

## SENTENCING PHASE ISSUES

### XII. (1.) THE JURY FAILED TO MAKE AN INDIVIDUALIZED FINDING OF THE DEGREE OF CLYDE SMITH'S PERSONAL CULPABILITY FOR THE HOMICIDE AS REQUIRED BY MISS. CODE ANN. § 99-19-101(7) AND THE EIGHTH AND FOURTEENTH AMENDMENTS TO THE CONSTITUTION.

¶117. When the jury returned the separate verdicts at the conclusion of the sentencing phase, the ***Enmund*** findings, with respect to Clyde, read as follows:

> We, the jury, as to Clyde Wendell Smith, unanimously find from the evidence beyond a reasonable doubt that the following facts existed at the time of the commission of the capital murder:
>
> 1) that the *defendants* actually killed Johnny Smith;
>
> 2) that the *defendants* intended the killing of Johnny Smith take place
>
> 3)that the *defendants* contemplated that lethal force be employed.

(emphasis added).

¶118. Clyde argues that inasmuch as the verdict contained the word "defendants" and not "defendant" that the jury failed to make an individual finding that Clyde personally either killed, intended to kill, or contemplated the use of lethal force, and therefore, the resulting death sentence violated the Eighth and Fourteenth Amendments, as well as ***Enmund v. Florida***, 458 U.S. 782 (1982), and the laws of this state. Clyde maintains that the lack of an individualized finding by the jury as to his culpability, warrants the reversal of his sentence in this case.

¶119. The State first argues a procedural bar which is supported by the record. The jury's verdict was copied directly from this sentencing instruction. Neither Clyde nor Jerome objected to Instruction S-1 or to the form of the verdict at trial or in their motions for new trial. Accordingly, the State argues that this claim has been waived and can not be raised for the first time on appeal. ***Ballenger***, 667 So. 2d at 1259.

¶120. In his reply brief, Clyde cites to *Pinkton v. State*, 481 So. 2d 306 (Miss. 1985), to support his argument that because of the jury's use of the plural "defendants" there was no individualized finding as to his culpability as required by Miss. Code Ann. § 99-19-101(7) (1994), which provides:

> In order to return and impose a sentence of death the jury must make a written finding of one or more of the following:
>
> (a) The defendant actually killed;
>
> (b) The defendant attempted to kill;
>
> (c) The defendant intended that a killing take place;
>
> (d) The defendant contemplated that lethal force would be employed.

¶121. In *Pinkton*, the defendant pled guilty to capital murder, the killing having occurred during an attempted armed robbery. A sentencing trial was then held and the death penalty imposed. The jury failed to make a separate finding of culpability as required under Miss. Code Ann. § 99-19-101(7), but instead "embarked directly upon the framing of findings relating to the aggravating circumstances." *Pinkton*, 481 So.2d at 309.

¶122. The question presented to this Court was "whether such an explicit finding is indispensable or whether it can be implied from the other findings or from the plea of guilty in the guilt phase." *Id.* In answering the question, the Court stated that its decision was to be controlled by the statute and not by federal constitutional considerations, and that the statute was not ambiguous. "A separate, explicit and written jury finding in accordance with the subsection is indispensable to the valid imposition of the death penalty." *Id.* at 310.

¶123. The State in *Pinkton* argued alternatively that Pinkton was procedurally barred from raising the issue on appeal, since there was no contemporaneous objection to the judge's failure to instruct the jury on the requirement for a § 99-19-101(7) finding. This Court found the argument without merit, stating:

> Although a more complete instruction might have prevented the jury's omission, that omission is nonetheless an event legally distinct from the judge's failure to instruct. The jury's obligation in this matter is, after all, independently imposed by the statute without reference to any action by the judge. Once this is understood, the state's argument immediately falls. Pinkton could raise no objection to the jury's dereliction until after its verdict was rendered, and then it was too late.

*Id.* at 310.

¶124. The case at bar differs from *Pinkton* in that the jury was instructed to return separate written findings as required by § 99-19-101(7) for both Clyde and Jerome, and it did so. The only real issue that must be resolved is whether the jury's use of the plural "defendants" somehow made the finding invalid. An analogous situation arose in *Conner v. State*, 632 So. 2d 1239, 1277 (Miss. 1993). There Conner sought reversal because in listing the aggravating circumstances in its written verdict the jury included the word "whether" before each aggravating factor listed. Conner argued "that the jury's use of the word 'whether' at the beginning of each clause indicate[d] that the jury merely 'parroted' the jury instruction and failed to engage in the mandatory fact-finding process." *Conner*, 632 So. 2d at 1277. This Court, in rejecting

Conner's argument, stated:

> Conner doomed this assignment of error before he ever raised it by failing to object to the verdict's form at trial. But, even if the objection were preserved, it has no merit. No one can reasonably conclude, on grounds that the word "whether" repeatedly appears in the verdict, that the jury did not fulfil its fact-finding duties. The verdict would certainly win no grammar award, but its meaning is perfectly clear. The jury found that all five aggravating circumstances existed and that the aggravating circumstances carried more weight than did mitigating circumstances.

*Id.* (citations omitted).

¶125. A similar argument can be made here. Sentencing Instruction S-1 informed the jury that it was to return separate verdicts for Clyde and Jerome. S-1 read in part:

> The verdict you return must be written on a separate sheet of paper signed by the foreman. Your verdict should be written in one of the following forms:
>
> 1. We, the Jury, as to Clyde Wendell Smith, unanimously find from the evidence beyond a reasonable doubt that the following facts existed at the time of the commission of the capital murder:
>
> (List or itemize all facts found, if any, from the list under Section A of this instruction which you unanimously agree exist in this case beyond a reasonable doubt.)

Section A of the instruction read as follows:

> To return the death penalty in this case you must first unanimously find from the evidence beyond a reasonable doubt that one or more of the following facts existed:
>
> 1. That the Defendants actually killed Johnny Smith; or
>
> 2. That the Defendants intended the killing of Johnny Smith take place; or
>
> 3. That the Defendants contemplated that lethal force would be employed.

¶126. The plural "Defendants" was used in S-1 because one instruction was submitted for both defendants. The jury when writing the separate verdicts for Clyde and Jerome copied the wording as it was written in the instruction. This does not mean that the jury did not make an individualized finding as to each defendant. What it does show is that the jury determined that each of the three factors applied equally to both Clyde and Jerome. The jury clearly intended these factors to apply to Clyde as it prefaced this section of its verdict with the words "as to Clyde Wendell Smith."

¶127. This claim is both procedurally barred and without merit.

### XIII. (2.) THE EVIDENCE WAS INSUFFICIENT TO PROVE THAT CLYDE SMITH KILLED, ATTEMPTED TO KILL, INTENDED TO KILL, OR CONTEMPLATED THE USE OF LETHAL FORCE.

¶128. Alternatively, Clyde argues that the evidence was insufficient as a matter of law to prove that he either actually killed the victim, intended that a killing take place, or contemplated the use of lethal force as

required by *Enmund* and as codified in Miss. Code Ann. § 99-19-101(7) (1994).

¶129. This Court's standard of review of a jury's findings under *Enmund* and Miss. Code Ann. § 99-19-101(7) was set out in *Abram v. State*, 606 So. 2d 1015, 1041-42 (Miss. 1992), as follows:

> On appeal, "we review the evidence and reasonable inferences which may be drawn therefrom in the light most consistent with the verdict. We have no authority to disturb the [jury] verdict short of a conclusion on our part that upon the evidence, taken in the light most favorable to the verdict, no rational trier of fact could have found the fact at issue beyond a reasonable doubt." *White v. State*, 532 So. 2d 1207, 1220 (Miss. 1988). This is the guide for testing the legal sufficiency of the evidence to support a finding under §99-19-101(7). . .

¶130. The question that must be answered here is whether there was sufficient evidence presented at trial to support, as to Clyde, a finding that he killed, intended a killing to take place, or contemplated that lethal force would be used. "Mississippi by statute requires more in the felony-murder scenario than major participation and reckless indifference to the value of human life." *Abram*, 606 So. 2d at 1042. *See also Carr v. State*, 655 So. 2d 824, 839 (Miss. 1995). The phrase "contemplation that lethal force will be used" has been defined as "[w]here, as a part of the pre-crime planning, a defendant includes in his plans the substantial probability that fatal force will be employed. . ." *Abram*, 606 So. 2d at 1043 (quoting *White*, 532 So. 2d at 1220-21).

¶131. The record reveals that Clyde was more than likely the instigator of the robbery in this case, as well as the one who planned it. Henry Bryant, the boyfriend of Clyde and Jerome's sister, testified that on the day of the robbery and murder, the brothers were at his house. He testified that Clyde made the comment that he was broke and needed money. During the conversation, Bryant stated to Clyde that it was hard to rob someone and get away with it. According to Bryant, Clyde responded by saying that if you go to a small town with few police then you can get away with it. The robbery and murder in the case at bar, fit Clyde's scenario perfectly, with the exception being that he got caught. Bryant's testimony also shows that Clyde was concerned about getting away from the scene without being caught by police. Bryant's testimony does not reveal any concern on the part of Clyde about being identified by any witnesses.

¶132. Bryant went on to testify that Jerome had in his possession on the day of the murder a shiny silver revolver and Clyde had a hunting knife. Carolyn Pearce also testified that the brothers were carrying such weapons following the murder and that at one point while she was with them they exchanged weapons. This testimony shows that both brothers were armed on the day of the robbery and that Clyde knew that Jerome had a gun. A similar situation was discussed in *Abram*, 606 So. 2d at 1043, as follows:

> Subjectively, we may never know what Abram intended or contemplated. However, it seems to us that a fair-minded and rational jury, drawing on these facts and any reasonable inferences arising therefrom, could have concluded beyond a reasonable doubt that Abram "included in his plans the substantial probability" that the loaded shotgun would be used as an instrument of lethal force "to insure the robbery's success."

*Abram*, 606 So. 2d at 1043 (citations omitted).

¶133. A fair-minded juror could make a reasonable inference from the fact that Clyde was armed with a knife and he knew Jerome was armed with a revolver that Clyde "included in his plans the substantial

probability" that lethal force would be used during the commission of the armed robbery to insure the robbery's success and to avoid arrest. *Id.*

¶134. Since the evidence supports the jury's finding of contemplation of lethal force, we need not discuss the other two factors found by the jury because pursuant to Miss. Code Ann. § 99-19-101(7) (1994), the jury need only find one in order to impose the death penalty. Since the evidence does support the jury's finding that Clyde contemplated the use of lethal force, this issue is without merit.

### XIV. (3.) THIS COURT SHOULD EXERCISE ITS POWER UNDER MISS. CODE ANN. § 99-19-105 TO FIX CLYDE SMITH'S SENTENCE AT LIFE IMPRISONMENT, GIVEN HIS MINIMAL PARTICIPATION IN THE HOMICIDE OF JOHN SMITH.

¶135. Clyde proposes that even if this Court finds that he should not prevail on his claim that the evidence is legally insufficient to support a finding of any of the *Enmund* factors, it should nevertheless vacate his sentence and fix his punishment at life in prison pursuant Miss. Code Ann. § 99-19-105 (1994). Clyde makes the standard "non-triggerman" proportionality argument. He maintains that the evidence shows that his participation in the crime, if any, was minimal, and that he was not the triggerman. He argues that his case is analogous to *Reddix v. State*, 547 So. 2d 792 (Miss. 1989), and *Bullock v. State*, 525 So. 2d 764 (Miss. 1987), wherein this Court reversed the death sentences of "non-triggermen", finding the sentences to be disproportionate.

¶136. In both *Reddix* and *Bullock*, a plurality of this Court found the death penalty to be disproportionate and remanded the case for the imposition of a life sentence. At the time of the trial in those cases *Enmund v. Florida* had not yet been decided.

¶137. In *Reddix*, the appellant was eighteen years of age at the time of the crime and suffered from mental illness and mild retardation. Reddix and his accomplice, Larry Jones, planned to rob Arthur Weinberger. Reddix distracted Weinberger while Jones hit him with a wrench. This Court in finding Reddix's sentence of death to be disproportionate discussed the holding in *Bullock*:

> Our proportionality decision in *Bullock*, rested on the fact that, with only two exceptions, "no capital defendant has had a death sentence affirmed in this state where the sole finding was that he contemplated that lethal force would be used." *Bullock*, 525 So. 2d at 770. We also noted that Bullock's accomplice, the actual killer, had received a life sentence, a point reinforcing our determination that justice required fixing Bullock's sentence at life imprisonment. *Id.* The same is true here.
>
> * * *
>
> Accordingly, we hold that Reddix'[s] death sentence is disproportionate to the penalty imposed in similar capital cases, considering both the crime and the appellant.

*Reddix*, 547 So. 2d at 794-95.

¶138. This Court has affirmed death sentences where the appellants were not the actual killers. In *Stringer v. State*, 454 So. 2d 468 (Miss. 1984), *cert. denied*, 469 U.S. 1230 (1985), Stringer, while not the actual triggerman, "was the instigator, the planner, the master-mind and the one who directed the entire occurrence. According to the testimony of the two participants, the attempted armed robbery and the killing

would not have occurred had it not been for appellant." *Id.* at 479. In *Leatherwood v. State*, 435 So. 2d 645 (Miss. 1983), this Court affirmed Leatherwood's sentence of death although he did not do the actual killing. This Court found it sufficient that Leatherwood "planned, schemed, and ultimately physically subdued the victim by choking him with a rope, while another stabbed and bludgeoned the victim to death." *Id.* at 656.

¶139. More recently in *Ballenger v. State*, 667 So. 2d 1242 (Miss. 1995), the jury's sentence of death was unanimously affirmed by this Court even though Ballenger was not even present when the actual robbery and beating that resulted in the victim's death took place. In affirming, the Court held, "like Stringer and Leatherwood, [Ballenger] instigated and planned the robbery of Ellis. Her actions secured others to kill."*Id.* at 1268.

¶140. As in *Stringer*, *Leatherwood*, and *Ballenger*, the evidence shows that Clyde was more than likely the instigator of the robbery in this case, as well as the one who planned it. Henry Bryant, the boyfriend of Clyde and Jerome's sister, testified that on the day of the robbery and murder, the brothers were at his house. He testified that Clyde made the comment that he was broke and needed money. During the conversation, Bryant stated to Clyde that it was hard to rob someone and get away with it. According to Bryant, Clyde responded by saying that if you go to a small town with few police then you can get away with it. The robbery and murder in the case at bar fit Clyde's scenario perfectly, with the exception being that he got caught.

¶141. Bryant went on to testify that Jerome had in his possession on the day of the murder a shiny silver revolver and Clyde had a hunting knife. Carolyn Pearce also testified that the brothers were carrying such weapons following the murder and that at one point while she was with them they exchanged weapons. This testimony shows that Clyde knew that Jerome had a gun prior to the robbery and there is an inference that he knew Jerome still had it when the robbery was committed.

¶142. It should also be noted that this case is distinguishable from *Reddix* and *Bullock* in that Clyde's co-defendant, the triggerman, was also sentenced to death. And, unlike Reddix, there is no evidence that Clyde suffered from any mental illness or retardation. Furthermore, Clyde had at least three prior convictions for felonies involving violence, including kidnapping and aggravated assault.

¶143. Taking all of these things into consideration, we find that the imposition of the death penalty is not disproportionate in this case.

> **XV. (5.) THE TRIAL COURT'S REFUSAL TO DISCHARGE THE JURY AFTER IT FAILED TO REACH A SENTENCING VERDICT AFTER A REASONABLE TIME, AND ITS FAILURE TO INSTRUCT THE JURY THAT IT COULD RETURN A VERDICT THAT IT COULD NOT AGREE AS TO SENTENCE, VIOLATED MISSISSIPPI LAW AND THE EIGHTH AMENDMENT TO THE UNITED STATES CONSTITUTION.**

¶144. Clyde argues that the trial court erred in refusing the defense motion to discharge the jury and sentence him to life imprisonment in accordance with Miss. Code Ann. § 99-19-103 (1994) when after over three hours of deliberation during the sentencing phase the jury had not agreed on a sentence. Clyde goes on to argue that the jury in the case *sub judice* was only given two sentencing options, death or life. Citing*Jenkins v. State*, 607 So. 2d 1171, 1180 (Miss. 1992), Clyde contends that most capital

sentencing juries are given a third option of "we the jury, are unable to agree unanimously on punishment." He argues that this deficiency violated the Eighth Amendment in that the jury's only options were unanimous life or unanimous death, citing *Kubat v. Thieret*, 867 F.2d 351, 370 (7th Cir. 1989).

¶145. Clyde maintains that even if this Court finds the third verdict option was not required, the absence of such an option places a greater burden on the trial judge to determine whether the jury should be discharged "after a reasonable time." It is his contention that a jury which cannot decide sentence in three hours is a jury which cannot reach a constitutionally valid death sentence at all.

¶146. The jury was excused to begin its deliberation on the sentencing verdicts at 12:38 p.m. However, the record shows that the jury was given the chance to eat lunch before the jurors actually were to begin deliberation. At 4:20 p.m. the defense made the following motion:

> **MR. STUCKEY**: Yes, sir, on behalf of Clyde Smith and also having been advised by the attorneys for Pete Smith, we would like to move the Court to consider a mistrial at this point with respect to sentencing. Our time indicated that the jury has been deliberating about three hours and fifteen minutes. It would appear that they are hung and I'm not sure any more time would get us anywhere. Three hours and fifteen minutes is sufficient time, I believe, to reach some decision and apparently they can't.
>
> That's the motion.
>
> **MR. CROOK**: May I respond, or do I need to respond.
>
> **THE COURT**: You don't need to respond. That'll be overruled. I'll take that under advisement, will consider that as we go along through the other time that we may require them to stay.

Subsequently, at 5:20 p.m. the jury returned the verdicts of death for both Clyde and Jerome.

¶147. In summary, the jury ate lunch, deliberated on sentences to be returned individually on two separate defendants, and in fact, returned those two verdicts, all in four hours and forty minutes. We do not deem this to be an excessive amount of time by any means. Apparently, the trial judge felt the same way since he overruled the motion. Pursuant to Miss. Code Ann. § 99-19-103 (1994), the determination of what is a reasonable time for deliberation is within the trial judge's discretion. Section 99-19-103 provides in part: "If the jury cannot, within a reasonable time, agree as to punishment, the judge shall dismiss the jury and impose a sentence of imprisonment for life."

¶148. Clyde argues that the jury should have been given a third sentencing option that they were unable to agree unanimously on punishment. This argument has been rejected by this Court on several occasions, most recently in *Blue v. State*, 674 So. 2d 1184 (Miss. 1996). *See also King v. State*, 421 So. 2d 1009 (Miss. 1982). In *King* this Court upheld the decision of trial court not to amend a jury instruction to include this third option. In so holding, the *King* Court stated:

> We are of the opinion that no error was committed in refusing the appellant's requested amendment to his instruction.
>
> First, the instruction, as given, informed the jurors that before they could sentence appellant to death, they must unanimously find one or more aggravating circumstance from the evidence beyond a

> reasonable doubt, and must further find there were insufficient mitigating circumstances to outweigh the aggravating circumstances. After being so instructed, the jury returned the following unanimous verdict:
>
> . . . .
>
> There was no indication in the record that they had any difficulty reaching an agreement.
>
> Secondly, the defendant's argument that the jury was not fully instructed overlooks the statutory duty imposed on the court by Mississippi Code Annotated section 99-19-103 (Supp. 1981) for the court to dismiss the jury after a reasonable period of deliberation and impose a life sentence on the defendant.
>
> The argument creates an illusion of prejudice, which has no logical basis. If the jurors were unable to unanimously find that the aggravating circumstances were sufficient to impose the death penalty and that there were insufficient mitigating circumstances to outweigh the aggravating circumstances, then they could not return a death sentence. Further, in the event they could not unanimously agree after a reasonable period of deliberation, it would be the trial judge's duty under Mississippi Code Annotated section 99-19-103 to dismiss the jury and impose a sentence of life imprisonment on the defendant.

*King*, 421 So. 2d at 1018.

¶149. Unlike King, Clyde did not ask that an amendment be made to the sentencing instruction to include a third option, thus barring this issue from review. Nevertheless, pursuant to Miss. Code Ann. § 99-19-103 (1994) and this Court's previous holdings, it was up to the trial judge to dismiss the jury and impose a life sentence if the jury had not reached a verdict within a reasonable amount of time. The trial judge was in a much better position than this Court to determine what was in fact a reasonable time. We can not say that under the unique circumstances of this case, especially considering the fact that the jury in essence had to go through two separate deliberations in order to follow the sentencing instructions and return separate verdicts for both Clyde and Jerome, that the jury did not reach its verdicts within a reasonable time. Therefore, this issue is without merit.

### XVI. (9.) THE USE OF THE "PRIOR VIOLENT FELONY" AGGRAVATING CIRCUMSTANCE IN THIS CASE WAS ERROR.

¶150. Clyde argues that the trial judge erred in allowing the State to offer, as an aggravating circumstance in the case, his convictions for aggravated assault since those convictions occurred after the crime for which he was on trial. Clyde acknowledges this Court's prior rulings have allowed criminal conduct occurring after the commission of the capital murder, but resulting in a conviction prior to the capital murder trial, to be used to support the prior violent felony aggravating circumstance. However, Clyde asks that this Court revisit the issue in light of contrary rulings in other jurisdictions.

¶151. It is unclear whether the actual crimes of aggravated assault actually occurred prior to or after the murder in the case at bar; however, it is clear that the convictions for those felonies were entered after the murder but before the trial in this case. Looking to State's Exhibit S-23, it also seems that the actual aggravated assaults occurred on August 27, 1992, prior to the murder in this case. Nevertheless, according to this Court's prior case law for aggravating circumstance purposes, it does not matter when the crime occurred, but when the conviction was entered. This Court has repeatedly held that "a conviction between

the time the capital offense was committed and the time of trial for it may be admitted into evidence as an aggravating circumstance." ***Leatherwood v. State***, 435 So. 2d 645, 651-52 (Miss. 1983). *See also* ***Turner v. State***, 573 So. 2d 657, 670 (Miss. 1990). Clyde asks that this Court rethink its previous holdings on this issue. The precedent on this issue is clear and consistent and we see no reason to change now. Accordingly, we find this issue to be without merit.

### XVII. (10.) THE SUBMISSION OF EVIDENCE OTHER THAN THE ACTUAL CONVICTION OF CLYDE SMITH OF KIDNAPING IN SUPPORT OF THE "PRIOR VIOLENT FELONY" AGGRAVATING CIRCUMSTANCE WAS ERROR.

¶152. Clyde contends that during the sentencing phase of the trial the trial court erred in allowing the State to prove his prior criminal record through the testimony of the Circuit Clerk of Humphreys County, Earl Tate. He also argues that the documentary evidence introduced as Exhibit S-23 was incompetent and therefore insufficient to prove that he was previously convicted of kidnaping making it error to allow the jury to use it as an aggravating factor.

¶153. Clyde relies on ***Stringer v. State***, 500 So. 2d 928, 942 (Miss. 1986), to support his contention that the proper evidence of a prior conviction for the "prior violent felony" aggravating circumstance is the order of conviction. This is a very limited reading of ***Stringer***, as exceptions are not uncommon. In fact, an exception was made in ***Stringer***. There this Court held:

> "The best evidence of a previous conviction is the judgement of conviction." ***McGown v. State***, 269 So. 2d 645, 649 (Miss. 1972). However, substitutes for the judgment of conviction have been allowed. In ***Vincent v. State***, 200 Miss. 423, 27 So. 2d 556 (1946), copies of docket entries of conviction were held to be sufficient, where they were certified by a justice of the peace. Similarly, in ***Lovelace v. State***, 410 So. 2d 876, 879 (Miss. 1982), abstracts of court records duly certified by a justice court judge were held to be sufficient. In ***Pace v. State***, 407 So. 2d 530 (Miss. 1981) original commitment papers were held to be sufficient to show a prior conviction.
>
> Miss. Code Ann. § 13-1-77 (1972) allows admission of public records into evidence where they are certified by their custodian. These records were introduced at trial by their custodian, Mr. Gladney. Therefore, their introduction was not error.

***Stringer***, 500 So. 2d at 942.

¶154. As in ***Stringer***, the records pertaining to Clyde's prior convictions were properly introduced by their custodian, Humphreys County Circuit Clerk Earl Tate, and the reason for such testimony was certification of the records. Although these records come from the file on Clyde's aggravated assault convictions, it did contain a document titled certified copy of sentence that shows that Clyde pled guilty on February 19, 1988, to the indictment in cause No. 4216 to the crime of kidnaping and was sentenced to serve a term of six years in the custody of the Mississippi Department of Corrections. Clyde offers no authority supporting his contention that the judgment of conviction must come from the file of the conviction itself.

¶155. Clyde refers to ***Johnson v. Mississippi***, 486 U.S. 578 (1988), and ***Johnson v. State***, 547 So. 2d 59 (Miss. 1989) *overruled on other grounds by* ***Clemons v. State***, 593 So. 2d 1004 (Miss. 1992) in a misplaced attempt to provide some authority for his incompetent evidence argument. These cases have no application to the issue at bar however. In those cases a prior conviction which was used in part to support

the "prior violent felony" aggravating circumstance was subsequently vacated. The United States Supreme Court held that Johnson was entitled to post-conviction relief because evidence supporting the aggravator had become incompetent. In the case at bar Clyde offers no evidence that his conviction and sentence for kidnaping has been reversed. This issue is without merit.

### XVIII. (11.) THE CIRCUIT JUDGE ERRED IN ALLOWING THE "FELONY-MURDER" AGGRAVATING CIRCUMSTANCE TO BE SUBMITTED TO THE JURY.

¶156. Clyde asserts that the trial court erred in allowing the State to use the aggravating circumstance of a murder committed during the course of an armed robbery. He makes his argument on two points. First, he contends that he was not given adequate notice that the State would be using this aggravating circumstance. Second, Clyde argues that the use of the "felony-murder" aggravating circumstance in a felony-murder case is unconstitutional in t hat it is not "determinate" and it does not genuinely narrow the class of defendants eligible for the death penalty. Clyde relies primarily on *Arave v. Creech*, 507 U.S. 463 (1993), in which the United States Supreme Court stated that, "[i]f the sentencer fairly could conclude that an aggravating circumstance applies to every defendant eligible for the death penalty, the circumstance is constitutionally infirm."*Id.* at 474.

¶157. This so-called doubling up argument that the use of the robbery aggravating circumstance in a robbery-murder case does not genuinely narrow the class of defendants eligible for the death penalty has consistently been rejected by this Court. *See Ballenger*, 667 So. 2d at 1260-61; *Ladner v. State*, 584 So. 2d 743, 762-63 (Miss. 1991); *Pinkney v. State*, 538 So. 2d 329, 358-59 (Miss. 1988), *vacated on other grounds*, 494 U.S. 1075 (1990); *Jones v. State*, 517 So. 2d 1295, 1300 (Miss. 1987), *vacated on other grounds*, 487 U.S. 1230 (1988) *overruled on other grounds by Willie v. State*, 585 So. 2d 660 (Miss. 1991). In *Ballenger*, the Court stated, "[t]he 'narrowing' of the class of death eligible offenders has been done legislatively in Mississippi under Miss. Code Ann. § 97-3-19(2) (1972 & Supp. 1994)". *Id.* at 1261. *See also Lowenfield v. Phelps*, 484 U.S. 231(1988).

¶158. Clyde's contention that the trial court erred in allowing the State to use the robbery aggravating circumstance because the State failed to give the defense adequate notice of its use is also without merit. Clyde cites no authority that the State is required to give notice of which aggravating circumstances will be relied upon during the sentencing phase. Instead, Clyde relies on the trial court's order granting the defense motion that such notice be given. In compliance with this order the State furnished the defense with a list of the aggravating circumstances it intended to rely upon. Among those listed by the State was the "pecuniary gain" aggravator. The State did not list the "during the commission of a robbery" aggravating circumstance.

¶159. After the guilt phase when the court and counsel were discussing which aggravating factors would be submitted to the jury, Clyde's attorneys argued that this Court, in the then recent decision of *Willie v. State*, 585 So. 2d 660 (Miss. 1991), had prohibited the use of the pecuniary gain aggravating factor in a felony-murder case where robbery is the underlying felony. The State correctly argued that *Willie* did not say this at all, but instead, held that the two aggravating circumstances of pecuniary gain and robbery should not both be submitted to the jury. Defense counsel could not be convinced, so the trial court amended the State's instruction deleting the pecuniary gain aggravating factor and replacing it with the robbery aggravator.

¶160. Clyde was not prejudiced in any way by this action. First, while the trial court ordered the State to provide the defense with a list of aggravating factors it intended to rely on there is no authority for such a

requirement. The State points out in its brief, that this Court in ***Williams v. State***, 445 So. 2d 798 (Miss. 1984), *cert. denied*, 469 U.S. 1117 (1985), held that the State was not required to give the defendant notice in the indictment of the aggravating factors it intended to use. In so holding, the ***Williams*** Court stated:

> We believe that the fact that our capital murder statute lists and defines to some degree the possible aggravating circumstances surely refutes the appellant's contention that he had inadequate notice. Anytime an individual is charged with murder, he is put on notice that the death penalty may result. And, our death penalty statute clearly states the only aggravating circumstances which may be relied upon by the prosecution in seeking the ultimate punishment. In our opinion, Williams received adequate notice.

***Williams***, 445 So. 2d at 804-05 (footnote omitted).

¶161. When the holding in ***Williams*** is taken together with this Court's ruling in ***Willie***, wherein it held that the two aggravators of robbery and pecuniary gain "essentially comprise one," and the fact that Clyde had been indicted for murder committed during the commission of armed robbery, he can not complain he did not have adequate notice. ***Willie***, 585 So. 2d at 681. Furthermore, Clyde's entire argument that he was prejudiced because of inadequate notice turns on the fact that he did not have an opportunity to make a reasoned objection to the disproportionality of using the robbery aggravator in a robbery-murder case is without merit. As pointed out above, this doubling up argument has been consistently rejected by this Court. *See* ***Ballenger***, 667 So. 2d at 1261. This issue must fail.

### XIX. (12.) THE TRIAL COURT'S INSTRUCTIONS TO THE JURY THAT THEY "MAY CONSIDER THE DETAILED CIRCUMSTANCES OF THE OFFENSE FOR WHICH THE DEFENDANT WAS CONVICTED" VIOLATED STATE LAW AND THE EIGHTH AMENDMENT.

¶162. Clyde argues that the trial court committed reversible error when it instructed the sentencing jury that it could consider the "detailed circumstances of the offense for which the Defendant was convicted." He contends that Mississippi law provides that at sentencing, the prosecution is limited to offering evidence that is relevant to one of the aggravating circumstances, and when the jury was told that it could consider the details of the offense it was given another, non-statutory, aggravator to consider.

¶163. As the State points out, Miss. Code Ann. § 99-19-101(1) (1994), provides in pertinent part, "In the proceeding, evidence may be presented as to any matter that the court deems relevant to sentence, and shall include matters relating to any of the aggravating or mitigating circumstances." As was just recently held by a majority of this Court in ***Doss v. State***, No. 93-DP-00509-SCT, 1997 WL 770606 (Miss. Dec. 15, 1997), the detailed circumstances of the offense are clearly matters relating to aggravating and mitigating circumstances as is provided for in this code section.

¶164. Such an instruction has also passed constitutional muster before the United States Supreme Court in ***Tuilaepa v. California***, 512 U.S. 967 (1994). In ***Tuilaepa*** the United States Supreme Court held:

> [O]ur capital jurisprudence has established that the sentencer should consider the circumstances of the crime in deciding whether to impose the death penalty. *See, e.g.,* ***Woodson*** [***v. North Carolina,*** 428 U.S. 280,] 304,[(1976)] ("[c]onsideration of . . . the circumstances of the particular offense [is] a

constitutionally indispensable part of the process of inflicting the penalty of death"). We would be hard pressed to invalidate a jury instruction that implements what we have said the law requires. . . . The circumstances of the crime are a traditional subject for consideration by the sentencer, and an instruction to consider the circumstances is neither vague nor otherwise improper under our Eighth Amendment jurisprudence.

*Tuilaepa*, 512 U.S. at 976.

¶165. For the reasons set forth above this issue is without merit.

### XX. (15.) THE PROSECUTOR VIOLATED THE EIGHTH AND FOURTEENTH AMENDMENTS AND THIS COURT'S CASE LAW IN HIS ARGUMENT AT THE SENTENCING PHASE.

¶166. Clyde takes issue with several statements made by the prosecution during its sentencing phase closing argument, arguing that the comments were improper and highly prejudicial, and when considered as a whole require reversal.

¶167. The record reveals no objection by the defense to any of these statements Clyde now claims to have been improper. As was recently reiterated by this Court in *Davis v. State*, 660 So. 2d 1228 (Miss. 1995), "[a] contemporaneous objection must be made to allegedly erroneous comments made during closing argument or the point is waived." *Id.* at 1251 (citing *Foster*, 639 So. 2d at 1289; *Gray v. State*, 487 So. 2d 1304 (Miss. 1986); *Shavers v. State*, 455 So. 2d 1299 (Miss. 1984)).

¶168. Not only was this issue not preserved for appeal, it is also without merit. First Clyde contends that the prosecutor spoke of the importance of the sentence on the victim's family, suggesting that these survivors desired the death sentence be imposed. The record does not bear out this contention. Nowhere does the prosecutor encourage the jury to impose the death penalty because it is important to the victim's survivors. Instead, the prosecutor points out to the jury that the case involves real people not just exhibits. Given the wide latitude generally afforded counsel in closing argument, taken together with the failure to object, this claim must fail. *See Hansen*, 592 So. 2d at 139-40; *Johnson*, 416 So. 2d at 392; *Gray*, 351 So. 2d at 1346-47.

¶169. Next, Clyde argues that the prosecutor misinformed the jury as to the law by telling it that since it had already returned a guilt phase verdict of capital murder against Clyde, that that necessarily included the death-penalty culpability findings that he actually killed, intended to kill, attempted to kill, or contemplated lethal force would be used. Again, Clyde misstates the prosecutor's comments. Instead, the prosecutor stated that by returning a guilty verdict against both Clyde and Jerome, the jury had already determined that at least one of the two brothers had such culpability. Again, given the wide latitude generally given counsel in closing argument, taken together with the failure to object, this claim must fail. *Hansen*, 592 So. 2d at 139-40.

¶170. Lastly, Clyde's contention that he was highly prejudiced by arguments of the prosecutor of the special heinousness of the murder and that the victim was shot in the back while fleeing from his assailant after having already been struck by another bullet is not supported by the record. Instead, the prosecutor set out a possible scenario in an attempt to rebut arguments made during closing arguments by the defense that this was not a "bad" murder. As previously stated, given the wide latitude generally afforded counsel in

closing argument, taken together with the failure to object, this claim must fail. *Hansen*, 592 So. 2d at 139-40.

### XXI. (16.) THE CIRCUIT JUDGE ERRONEOUSLY INSTRUCTED THE JURY THAT DEATH COULD BE IMPOSED IF AGGRAVATING AND MITIGATING CIRCUMSTANCES WERE OF EQUAL WEIGHT.

¶171. Clyde takes exception to the following language in sentencing instruction S-1:

If you find from the evidence that one or more of the preceding elements of mitigation exists, then you must consider whether it (or they) outweigh(s) or overcome(s) the aggravating circumstance(s) you previously found. In the event that you find that the mitigating circumstance(s) do not outweigh or overcome the aggravating circumstance(s), you may impose the death sentence. Should you find that the mitigating circumstance(s) outweigh or overcome the aggravating circumstance(s), you shall not impose the death sentence.

Clyde argues that this language improperly created a presumption in favor of death, in that a death sentence would result if the jurors found the aggravating and mitigating factors to be in equipoise.

¶172. The State first argues another procedural bar since Clyde failed to bring the issue before the trial court. Such a procedural bar is supported by the record. "A trial judge will not be found in error on a matter not presented to him for decision." *Jones v. State,* 606 So. 2d at 1058.

¶173. Not only is this issue procedurally barred, it is also without merit, as identical arguments have been consistently rejected by this Court. In *Davis*, 660 So. 2d at 1245, the Court held:

Davis' second contention is foreclosed by this Court's recent decision in *Conner v. State*, 632 So. 2d 1239 (Miss. 1993), *cert. denied*, 115 S. Ct. 314, 130 L. Ed. 2d 276 (1994). Conner, like Davis, argued "that a proper instruction would permit imposition of the death penalty only where the jury finds that aggravating circumstances outweigh mitigating circumstances, not vice versa." *Conner*, 632 So. 2d at 1278. *See also Shell v. State*, 554 So. 2d 887, 904 (Miss. 1989), *rev'd on other grounds*, 498 U.S. 1, 111 S. Ct. 313, 112 L. Ed. 2d 1 (1990); *Jordan v. State*, 365 So. 2d 1198, 1206 (Miss. 1978), *cert. denied*, 444 U.S. 885, 100 S. Ct. 175, 62 L. Ed. 2d 114 (1979); *Gray v. Lucas,* 677 F.2d 1086, 1105-06 (5th Cir. 1982), *cert. denied,* 461 U.S. 910, 103 S. Ct. 1886, 76 L. Ed. 2d 815 (1983). We rejected this argument in*Conner*, and today, we find no reason to vary from our holding in *Conner*. Accordingly, Davis merits no relief on this issue.

*Id*. *See also Doss v. State*, No. 93-DP-00509-SCT, 1997 WL 770606 (Miss. Dec. 15, 1997)(identical language complained about here found to be acceptable).

¶174. The sentencing instruction complained of in the case at bar does not create a presumption of death nor does it require the sentencing jury to return a verdict of death if mitigating and aggravating factors are equipoise. This issue lacks merit.

### XXII. (22.) THE DEATH SENTENCE SHOULD BE REVERSED DUE TO THE ACCUMULATION OF ERROR THAT OCCURRED AT SENTENCING.

¶175. Finally, Clyde points out that there exists a heightened scrutiny in death penalty cases which includes

a review for cumulative error. Citing *Russell v. State*, 607 So. 2d 1107, 1117 (Miss. 1992); *Hansen v. State*, 592 So. 2d at 142; *Stringer v. State*, 500 So. 2d at 946; and *Hickson v. State*, 472 So. 2d 379, 385-86 (Miss. 1985), Clyde maintains that should this Court not find any one error sufficient to warrant reversal of the death sentence in this case, the accumulation of such errors should be taken into consideration and the sentence reversed because of cumulative error.

¶176. While it is true that this Court is obligated to review capital cases "with heightened scrutiny," the errors in this case, if any, do not have such a cumulative effect as to require reversal. *Hansen,* 592 So. 2d at 153. This issue is without merit.

## CONCLUSION

¶177. For the reasons set forth above, this case is affirmed both as to guilt and as to sentencing.

¶178. **CONVICTION OF CAPITAL MURDER AND SENTENCE OF DEATH AFFIRMED. EXECUTION DATE TO BE SET WITHIN SIXTY DAYS OF FINAL DISPOSITION OF THIS CASE PURSUANT TO MISS. CODE ANN. § 99-19-105(7) (1972) AND M.R.A.P. 41(a).**

**PITTMAN, P.J., SMITH AND MILLS, JJ., CONCUR. McRAE, J., CONCURS IN RESULT ONLY. BANKS, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY PRATHER, C.J., AND SULLIVAN, P.J. WALLER, J., NOT PARTICIPATING.**

**BANKS, JUSTICE, DISSENTING**:

¶179. This case presents the question whether the trial court abused its discretion in allowing a death penalty defendant to override his attorneys' advice concerning trial strategy. Because, in my view, the court erred and because that error demonstrably and adversely affected the defendant in the penalty phase, I would reverse as to penalty and remand for a new trial on that issue.

I.

¶180. On their motion, through counsel, these defendants were granted a severance. Thereafter it was brought to the attention of the court that they, against the advice of counsel, desired to be tried togther during both phases of the trial. Counsel made it clear that they strongly recommended separate trials, especially during the penalty phase. Nevertheless, the trial court acquiesced in the desire of the brothers to be tried together.

¶181. There are certain decisions deemed fundamental over which a defendant represented by counsel has ultimate authority. These decisions, according to most authorities are: (1) whether to plead guilty, (2) whether to waive jury trial, (3) whether to testify in his own behalf, (4) whether to appeal. *Jones v. Barnes*, 463 U.S. 745, 751 (1983); *People v. Colon*, 682 N.E.2d 978, 979 (N.Y. 1997); *People v. Davison*, 686 N.E.2d 1231 (Ill. App. Ct. 1997); *See also* Miss. R.ules of Prof. Conduct 1.2(a) ("In a criminal case, a lawyer shall abide by the client's decision, after consultations with the lawyer, as to a plea to be entered, whether to waive jury trial and whether the client will testify."). Additionally, as recognized in *Jones* and, in this state, provided in the constitution, electing to act as his own advocate is a fundamental choice of the defendant. *Jones*, 463 U. S. at 751; Miss. Const. art. 3, § 25.

¶182. Other decisions fall into the category of strategic and tactical decisions for which defendants are deemed to have reposed decision making authority in the lawyer. *People v. Colon*, 682 N.E. 2d at 979. These include, according to a New York court, the determination whether to seek a severance. *People v. Marcotte,* 655 N.Y.S.2d 433 (N.Y. App. Div. 1997). This is the only decision that the writer has been able to find which speaks directly to the issue of severance in this context.

¶183. There does not appear to be a bright line rule for what decisions other than those enumerated above are subject to the defendant's control. There is considerable overlap between that which might be considered fundamental and that which is deemed purely strategic or tactical. *See*, 2 W. LaFave & J. Israel, Criminal Procedure, § 11.6 (b) (1984). It is clear, however, that all of those deemed fundamental are ones to which the defendant has an absolute right.

¶184. No defendant has a right to insist upon being tried with another, either through counsel or otherwise. While circumstances may dictate that the converse, the failure to grant a severance, may offend due process, there appears to be no authority in support of the proposition that one criminal defendant has a right to be tried with another. *Thompson v. State*, 231 Miss. 624, 627, 97 So. 2d 227 (1957) ("A right to a separate trial does not give defendants the right to demand to be tried jointly..."). It follows, in my view, that the issue of whether to be tried jointly is one consigned to the control of counsel, not the client. The record does not reflect any adequate grounds for relinquishing that control. The trial court abused its discretion in vacating an order granting severance at the behest of the defendant against the advice of counsel. *See Blanco v. Singletary*, 943 F.2d 1477 (11th Cir. 1991).

II.

¶185. Having determined that there was error it is necessary to determine whether that error requires reversal. The evidence of guilt was, in my view, not substantially affected by the fact that these defendants were tried jointly. The penalty phase is another story.

¶186. Jerome, who was certainly adversely affected by association with his brother's prior criminal record, was required through counsel to contrast himself with Clyde and suggest that Clyde was more deserving of death.[17] Moreover, the fact of a joint trial contributed to the circumstance that we are faced with less than a complete record of individualized consideration of the *Enmund*[18] factors in this case.

¶187. Our statutory scheme codifying the *Enmund* factors[19], requires a "separate, explicit and written jury finding" that a death penalty defendant killed, attempted to kill, intended to kill, or contemplated that lethal force would be employed. *See Pinkton v. State*, 481 So. 2d 306 (Miss. 1985). The verdict in this case is couched in terms of "the defendants" leading to the question whether the jury attributed the actions and mind set of one brother to the other. This especially is the case in light of the prosecutor's argument on this issue which consistently referred to they and made no attempt to individualize the defendants in regard to the *Enmund* factors. Only when he turned to aggravating circumstances, saying "at this point because you have to make separate decisions," did the prosecutor make a point of individualizing the defendants. While the majority concludes that the jury "clearly intended" that the *Enmund* factors apply to Clyde, we should not be put into the position of having to surmise. The statute commands that the jury say it.

¶188. This latter error was not the inevitable result of the decision to vacate the severance order. It could have been prevented even in a joint trial with proper care. Proper care was not taken however, and the failure to do so together with the fact that the death penalty phase was impermissibly and inevitably infected by the presence of two defendants, adversely affecting individualized treatment, compels reversal and retrial.

**PRATHER, C.J., AND SULLIVAN, P.J., JOIN THIS OPINION.**

## APPENDIX

## DEATH CASES AFFIRMED BY THIS COURT

*Crawford v. State,* 716 So. 2d 1028 (Miss. 1998).

*Doss v. State,* 709 So. 2d 369 (Miss. 1996).

*Underwood v. State,* 708 So. 2d 18 (Miss. 1998).

*Holland v. State,* 705 So. 2d 307 (Miss. 1997).

*Wells v. State,* 698 So. 2d 497 (Miss. 1997).

*Wilcher v. State,* 697 So. 2d 1123 (Miss. 1997).

*Wilcher v. State,* 697 So. 2d 1087 (Miss. 1997).

*Wiley v. State,* 691 So. 2d 959 (Miss. 1997).

*Brown v. State*, 690 So. 2d 276 (Miss. 1996).

*Simon v. State*, 688 So. 2d 791 (Miss.1997).

*Jackson v. State*, 684 So. 2d 1213 (Miss. 1996).

*Williams v. State,* 684 So. 2d 1179 (Miss. 1996).

*Davis v. State,* 684 So. 2d 643 (Miss. 1996).

*Taylor v. State*, 682 So. 2d. 359 (Miss. 1996).

*Brown v. State*, 682 So. 2d 340 (Miss. 1996).

*Blue v. State*, 674 So. 2d 1184 (Miss. 1996).

*Holly v. State*, 671 So. 2d 32 (Miss. 1996).

*Walker v. State*, 671 So. 2d 581(Miss. 1995).

*Russell v. State*, 670 So. 2d 816 (Miss. 1995).

*Ballenger v. State*, 667 So. 2d 1242 (Miss. 1995).

*Davis v. State*, 660 So. 2d 1228 (Miss. 1995).

*Carr v. State*, 655 So. 2d 824 (Miss. 1995).

*Mack v. State*, 650 So. 2d 1289 (Miss. 1994).

*Chase v. State*, 645 So. 2d 829 (Miss. 1994).


## DEATH CASES AFFIRMED BY THIS COURT

### (continued)

*Foster v. State*, 639 So. 2d 1263 (Miss. 1994).

*Conner v. State*, 632 So. 2d 1239 (Miss. 1993).

*Hansen v. State*, 592 So. 2d 114 (Miss. 1991).

***Shell v. State**, 554 So. 2d 887 (Miss. 1989), **Shell v. Mississippi,** 498 U.S. 1 (1990) reversing, in part, and remanding, **Shell v. State**, 595 So. 2d 1323 (Miss. 1992) remanding for new sentencing hearing.

*Davis v. State*, 551 So. 2d 165 (Miss. 1989).

*Minnick v. State*, 551 So. 2d 77 (Miss. 1989).

***Pinkney v. State**, 538 So. 2d 329 (Miss. 1989), **Pinkney v. Mississippi**, 494 U.S. 1075 (1990) vacating and remanding **Pinkney v. State**, 602 So. 2d 1177 (Miss. 1992) remanding for new sentencing

hearing.

**\*Clemons v. State**, 535 So. 2d 1354 (Miss. 1988), **Clemons v. Mississippi**, 494 U.S. 738 (1990) vacating and remanding, **Clemons v. State**, 593 So. 2d 1004 (Miss. 1992) remanding for new sentencing hearing.

**Woodward v. State**, 533 So. 2d 418 (Miss. 1988).

**Nixon v. State**, 533 So. 2d 1078 (Miss. 1987).

**Cole v. State**, 525 So. 2d 365 (Miss. 1987).

**Lockett v. State**, 517 So. 2d 1346 (Miss. 1987).

**Lockett v. State**, 517 So. 2d 1317 (Miss. 1987).

**Faraga v. State**, 514 So. 2d 295 (Miss. 1987).

**\*Jones v. State**, 517 So. 2d 1295 (Miss. 1987)**, Jones v. Mississippi**, 487 U.S. 1230 (1988) vacating and remanding, **Jones v. State**, 602 So. 2d 1170 (Miss. 1992) remanding for new sentencing hearing.

**Wiley v. State**, 484 So. 2d 339 (Miss. 1986).

## DEATH CASES AFFIRMED BY THIS COURT

### (continued)

**Johnson v. State**, 477 So. 2d 196 (Miss. 1985).

**Gray v. State**, 472 So. 2d 409 (Miss. 1985).

**Cabello v. State**, 471 So. 2d 332 (Miss. 1985).

**Jordan v. State**, 464 So. 2d 475 (Miss. 1985).

**Wilcher v. State**, 455 So. 2d 727 (Miss. 1984).

**Billiot v. State**, 454 So. 2d 445 (Miss. 1984).

**Stringer v. State**, 454 So. 2d 468 (Miss. 1984).

**Dufour v. State**, 453 So. 2d 337 (Miss. 1984).

**Neal v. State**, 451 So. 2d 743 (Miss. 1984).

**Booker v. State**, 449 So. 2d 209 (Miss. 1984).

*Wilcher v. State*, 448 So. 2d 927 (Miss. 1984).

*Caldwell v. State*, 443 So. 2d 806 (Miss. 1983).

*Irving v. State*, 441 So. 2d 846 (Miss. 1983).

*Tokman v. State*, 435 So. 2d 664 (Miss. 1983).

*Leatherwood v. State*, 435 So. 2d 645 (Miss. 1983).

*Hill v. State*, 432 So. 2d 427 (Miss. 1983).

*Pruett v. State*, 431 So. 2d 1101 (Miss. 1983).

*Gilliard v. State*, 428 So. 2d 576 (Miss. 1983).

*Evans v. State*, 422 So. 2d 737 (Miss. 1982).

*King v. State*, 421 So. 2d 1009 (Miss. 1982).

*Wheat v. State*, 420 So. 2d 229 (Miss. 1982).

*Smith v. State*, 419 So. 2d 563 (Miss. 1982).

*Johnson v. State*, 416 So. 2d 383 (Miss.1982).

## DEATH CASES AFFIRMED BY THIS COURT

### (continued)

*Edwards v. State*, 413 So. 2d 1007 (Miss. 1982).

*Bullock v. State*, 391 So. 2d 601 (Miss. 1980).

*Reddix v. State*, 381 So. 2d 999 (Miss. 1980).

*Jones v. State*, 381 So. 2d 983 (Miss. 1980).

*Culberson v. State*, 379 So. 2d 499 (Miss. 1979).

*Gray v. State*, 375 So. 2d 994 (Miss. 1979).

*Jordan v. State*, 365 So. 2d 1198 (Miss. 1978).

*Voyles v. State*, 362 So. 2d 1236 (Miss. 1978).

*Irving v. State*, 361 So. 2d 1360 (Miss. 1978).

*Washington v. State*, 361 So. 2d 6l (Miss. 1978).

*Bell v. State*, 360 So. 2d 1206 (Miss. 1978).

\* Case was originally affirmed in this Court but on remand from U. S. Supreme Court,case was remanded by this Court for a new sentencing hearing.

## DEATH CASES REVERSED AS TO GUILT PHASE

## <u>AND SENTENCE PHASE</u>

*Kolberg v. State,* 704 So. 2d 1307 (Miss. 1997).

*Snelson v. State,* 704 So. 2d 452 (Miss. 1997).

*Fusilier v. State*, 702 So. 2d 388 (Miss. 1997).

*Howard v. State,* 701 So. 2d 274 (Miss. 1997).

*Lester v. State,* 692 So. 2d 755 (Miss. 1997).

*Hunter v. State*, 684 So. 2d 625 (Miss. 1996).

*Lanier v. State*, 684 So. 2d 93 (Miss. 1996).

*Giles v. State,* 650 So. 2d 846 (Miss. 1995).

*Duplantis v. State*, 644 So. 2d 1235 (Miss. 1994).

*Harrison v. State*, 635 So. 2d 894 (Miss. 1994).

*Butler v. State*, 608 So. 2d 314 (Miss. 1992).

*Jenkins v. State*, 607 So. 2d 1171 (Miss. 1992).

*Abram v. State*, 606 So. 2d 1015 (Miss. 1992).

*Balfour v. State*, 598 So. 2d 731 (Miss. 1992).

*Griffin v. State*, 557 So. 2d 542 (Miss. 1990).

*Bevill v. State*, 556 So. 2d 699 (Miss. 1990).

*West v. State*, 553 So. 2d 8 (Miss. 1989).

*Leatherwood v. State*, 548 So. 2d 389 (Miss. 1989).

*Mease v. State*, 539 So. 2d 1324 (Miss. 1989).

*Houston v. State*, 531 So. 2d 598 (Miss. 1988).

*West v. State*, 519 So. 2d 418 (Miss. 1988).

*Davis v. State*, 512 So. 2d 129l (Miss. 1987).

*Williamson v. State*, 512 So. 2d 868 (Miss. 1987).

*Foster v. State*, 508 So. 2d 1111 (Miss. 1987).


## DEATH CASES REVERSED AS TO GUILT PHASE

## AND SENTENCE PHASE

### (continued)

*Smith v. State*, 499 So. 2d 750 (Miss. 1986).

*West v. State*, 485 So. 2d 681 (Miss. 1985).

*Fisher v. State*, 481 So. 2d 203 (Miss. 1985).

*Johnson v. State*, 476 So. 2d 1195 (Miss. 1985).

*Fuselier v. State*, 468 So. 2d 45 (Miss. 1985).

*West v. State*, 463 So. 2d 1048 (Miss. 1985).

*Jones v. State*, 461 So. 2d 686 (Miss. 1984).

*Moffett v. State*, 456 So. 2d 714 (Miss. 1984).

*Lanier v. State*, 450 So. 2d 69 (Miss. 1984).

*Laney v. State*, 421 So. 2d 1216 (Miss. 1982).


## DEATH CASES REVERSED

## AS TO PUNISHMENT AND REMANDED

## FOR RESENTENCING TO LIFE IMPRISONMENT

*Reddix v. State*, 547 So. 2d 792 (Miss. 1989).

*Wheeler v. State*, 536 So. 2d 1341 (Miss. 1988).

*White v. State*, 532 So. 2d 1207 (Miss. 1988).

*Bullock v. State*, 525 So. 2d 764 (Miss. 1987).

*Edwards v. State*, 441 So. 2d 84 (Miss. l983).

*Dycus v. State*, 440 So. 2d 246 (Miss. 1983).

*Coleman v. State*, 378 So. 2d 640 (Miss. 1979).


# DEATH CASES REVERSED AS TO

# PUNISHMENT AND REMANDED FOR A NEW TRIAL

# <u>ON SENTENCING PHASE ONLY</u>

*Berry v. State,* 703 So. 2d 269 (Miss. 1997).

*Booker v. State*, 699 So. 2d 132 (Miss. 1997).

*Taylor v. State*, 672 So. 2d 1246 (Miss. 1996).

***Shell v. State***, 554 So. 2d 887 (Miss. 1989), ***Shell v. Mississippi***, 498 U.S. 1 (1990) reversing, in part, and remanding, ***Shell v. State*** 595 So. 2d 1323 (Miss. 1992) remanding for new sentencing hearing.

***Pinkney v. State***, 538 So. 2d 329 (Miss. 1989), ***Pinkney v. Mississippi,*** 494 U.S. 1075 (1990) vacating and remanding, ***Pinkney v. State,*** 602 So. 2d 1177 (Miss. 1992) remanding for new sentencing hearing.

***Clemons v. State***, 535 So. 2d 1354 (Miss. 1988), ***Clemons v. Mississippi***, 494 U.S. 738 (1990) vacating and remanding, ***Clemons v. State***, 593 So. 2d 1004 (Miss. 1992) remanding for new sentencing hearing.

***Jones v. State***, 517 So. 2d 1295 (Miss. 1987), ***Jones v. Mississippi,*** 487 U.S. 1230 (1988) vacating and remanding, ***Jones v. State***, 602 So. 2d 1170 (Miss. 1992) remanding for new sentencing hearing.

*Russell v. State*, 607 So. 2d 1107 (Miss. 1992).

*Holland v. State*, 587 So. 2d 848 (Miss. 1991).

*Willie v. State*, 585 So. 2d 660 (Miss. 1991).

*Ladner v. State*, 584 So. 2d 743 (Miss. 1991).

*Mackbee v. State*, 575 So. 2d 16 (Miss. 1990).

*Berry v. State*, 575 So. 2d 1 (Miss. 1990).

*Turner v. State*, 573 So. 2d 657 (Miss. 1990).

*State v. Tokman*, 564 So. 2d 1339 (Miss. 1990).

*Johnson v. State*, 547 So. 2d 59 (Miss. 1989).

*Williams v. State*, 544 So. 2d 782 (Miss. 1989); *sentence aff'd* 684 So. 2d 1179 (Miss. 1996)

# DEATH CASES REVERSED AS TO

# PUNISHMENT AND REMANDED FOR A NEW TRIAL

# <u>ON SENTENCING PHASE ONLY</u>

## <u>(continued)</u>

*Lanier v. State*, 533 So. 2d 473 (Miss. 1988).

*Stringer v. State*, 500 So. 2d 928 (Miss. 1986).

*Pinkton v. State*, 481 So. 2d 306 (Miss. 1985).

*Mhoon v. State*, 464 So. 2d 77 (Miss. 1985).

*Cannaday v. State*, 455 So. 2d 713 (Miss. 1984).

*Wiley v. State*, 449 So. 2d 756 (Miss. 1984); resentencing affirmed, *Wiley v. State*, 484 So. 2d 339 (Miss. 1986), *cert. denied Wiley v. Mississippi*, 479 U.S. 1036 (1988); resentencing ordered, *Wiley v. State*, 635 So. 2d 802 (Miss. 1993) following writ of habeas corpus issued pursuant to *Wiley v. Puckett*, 969 So. 2d 86, 105-106 (5th Cir. 1992); resentencing affirmed, *Wiley v. State*, 95-DP-00149, February 13, 1997 (rehearing pending).

*Williams v. State*, 445 So. 2d 798 (Miss. 1984).

\* Case was originally affirmed in this Court but on remand from U. S. Supreme Court, case was remanded by this Court for a new sentencing hearing.

1. Because both defendants, the victim, and a number of witnesses in this case all have the last name "Smith", first names will be used throughout this opinion.

2. The victim was not related to the defendants.

3. Jerome Pete Smith appeals his conviction and sentence separately.

4. Issue numbers used by appellant are in parentheses.

5. Although Clyde sets out 7(A) and 7(B) as separate sub-issues of Issue 7, he argues them together.

6. The trial court did not allow any testimony concerning the alleged rape.

7. Now Uniform Rule of Circuit and County Court Practice 9.04.

8. Now Uniform Rule of Circuit and County Court Practice 9.05.

9. Clyde cites to **Wilcher v. State,** 455 So. 2d 727, 734 (Miss. 1984), *cert. denied*, 470 U.S. 1034 (1985); **Sayles v. State,** 552 So. 2d 1383, 1390 (Miss. 1989); and **Gangl v. State,** 539 So. 2d 132, 135 (Miss. 1989), as supporting authority.

10. Clyde did not refer to this testimony during his discussion of this issue.

11. One picture of the automobile had already been offered into evidence as Exhibit S-12 without objection during the testimony of Officer J.D. Roseman.

12. Neither of these cases support Clyde's argument. **Smith** concerns the introduction of other crimes evidence and in **Balfour** the prosecutor was in effect "testifying" while questioning a witness who continually pled the Fifth Amendment.

13. In none of the cases cited by Clyde did the Court reverse based merely on the prosecution's vilification of the defendant. Those cases that were reversed were done so on other grounds or because of cumulative errors.

14. In **Johns v. State,** 592 So. 2d 86, 90 (Miss. 1991), the only case cited by Clyde in support of this proposition is not on point. In that case this Court held that the conviction of a co-indictee to the same offense charged is not competent evidence on the trial of the other. It did not involve an instance as Clyde suggests where the jury was told to compare the evidence required for conviction in an unrelated case in

order to determine the legal standard required in the case before it.

15. Clyde provides no supporting authority from this State, but instead cites cases from other jurisdictions. In the cases he does cite, the comments made by the prosecutor were far more egregious than in the case at bar. In fact in one of the cases cited, *Tucker v. Kemp,* 762 F.2d 1480 (11th Cir.) *vacated*, 474 U.S. 1001 (1985), the Eleventh Circuit affirmed even though the prosecutor during a capital sentencing hearing discussed the infrequency of the district attorney's office seeking the death penalty, stated personal opinion concerning the defendant's chance for rehabilitation, and commented that a life sentence would put a burden on the taxpayers.

16. The State utilized a model or drawing of the town of Sidon for use by the witnesses to illustrate their testimony.

17. Jerome was sentenced to death but his penalty has been reversed for a new trial on other grounds.

18. *Enmund v. Florida*, 458 U.S. 782 (1982).

19. *Miss. Code Ann.* § 99-19-101(7) (1994).